WILLIAM L. GILMAN, JR., *et al.*, Plaintiffs-Appellants, v. GENE KESSLER, d/b/a Gene's Oasis, *et al.*, Defendants-Appellees.

Second District No. 2—89—0310

Opinion filed December 29, 1989.

632

John A. Leemon, of Mount Carroll, for appellants.

Jack L. Brooks, of Bozeman, Neighbour, Patton & Noe, of Moline, and Robert L. Ellison, of Klockau, McCarthy, Ellison & Marquis, P.C., of Rock Island, for appellee Gene Kessler.

Raphael E. Yalden II and Joseph D. Olsen, both of DeBruyne, Yalden & Olsen, of Rockford, for appellee Sue Mills.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, William and Cathy Gilman, appeal from jury's verdicts entered against them on their dramshop and negligence actions brought against defendants, Gene Kessler, d/b/a Gene's Oasis, and Sue Mills, d/b/a Palisades Tap. The actions arose from an incident occurring between William Gilman and John Rubio, at Gene's Oasis on November 8, 1984. Rubio was allegedly intoxicated at the time. William was injured as a result of the incident and brought suit against the owner of Gene's Oasis and the owner of Palisades Tap, a tavern Rubio had visited earlier that day. The jury returned verdicts against plaintiffs, and the trial court entered judgment on the verdicts. Plaintiffs filed this appeal. Plaintiffs raise the following issues on appeal: (1) whether the jury verdicts are supported by the evidence; (2) whether the trial court erred in finding that provocation was a defense to the negligence actions; (3) whether defendants' closing arguments were improper and prejudicial to plaintiffs; (4) whether the trial court incorrectly permitted defendants to question witnesses as to their intoxication; and (5) whether the jury instructions were erro-

neous and misleading. We affirm.

The facts, as set forth by the parties at trial and in their briefs presented to this court, are complicated and controversial. Below, we have summarized the facts and testimony pertinent to this appeal.

On November 8, 1984, at 2 p.m., John Rubio picked up his then girlfriend, Candy Orth, at Pool 13 Supper Club, where they each had one beer. They then went to Gene's Oasis at approximately 2:30 p.m. where Rubio had two or three beers. Rubio and Candy left Gene's at approximately 4:30 p.m. with Glen and Terry Derrer and went to Palisades Tap. Candy testified that Rubio had "maybe three beers and a couple of peach schnapps" at Palisades. Rubio, Candy and the Derrers then went to the Derrers' home, where Rubio had nothing to drink. Rubio and Candy stayed at the Derrers for an hour or two and then returned to Palisades where, according to Candy, Rubio had "a can of beer and peach schnapps on the rocks." Candy testified that Rubio got into an argument at Palisades with Gary Derickson. The bartender at Palisades, Terry Prowant, told Rubio "to get out," which he did. Candy opined that Rubio was "definitely intoxicated" at that time and she, herself, was "not far behind."

Terry Prowant, the bartender at Palisades and defendant Sue Mill's sister, testified that she served Rubio one drink that night. She stated that Rubio got into an argument with Vinny Poliso, not Gary Derickson. Prowant stated that she then asked Rubio to leave and that he did. Prowant did not recall Rubio slurring his words or having any problems walking that night. However, she did testify that Rubio was obnoxious. When asked, "Did you tell Bill Gilman that John Rubio was intoxicated when he was there that evening?" she testified, "[t]he longer he was there, it was more noticeable, yeah."

From Palisades, Rubio and Candy proceeded to Gene's Oasis. Approximately 30 patrons were present at Gene's that evening with only one employee working, Brenda Brinkmeier. What occurred after Rubio arrived varies somewhat with each witness.

William Gilman testified that he had been at Gene's since approximately 7:15 p.m. playing pool in a league along with Rick Miller, Kent Rettenberger, Lee Woodhurst and Rick Crest. According to William, Rubio was loud, angry and obnoxious when he entered Gene's, which was sometime after 10 p.m.. Shortly after Rubio arrived, he kicked a bar stool at Dick Arisio and had a few words with him. About five minutes later, Rubio yelled obscenities at Lee Woodhurst. However, nothing became of the incident, and Rubio did not pursue it. Ten minutes later, Rubio shoved Woodhurst and there was more shouting.

William testified that the physical contact between Rubio and

Woodhurst ceased "for a little while." About 10 minutes after the second episode between Woodhurst and Rubio, William Gilman went to the restroom. When William exited the restroom about two minutes later, he observed a scuffle 20 to 30 feet away between Kent Rettenberger, John Rubio, and Lee Woodhurst. Rettenberger was trying to "contain" Rubio, who was trying "to get at" Woodhurst. William testified that he thought Rubio had a hold of Woodhurst's arm and that Rettenberger was trying to break the hold. William then walked over to Rubio, grabbed his arm, and told him to "knock it off." According to William, Rubio kept after Woodhurst, so William picked Rubio up and "set" him on a table so Woodhurst could get out the back door. William then released Rubio "because they were friends" and stepped back a couple of steps. Rubio then shoved William back, pulled William's shirt over his head, and shoved William again. As William braced himself against Rubio's shove, his knee "went" and he fell to the floor.

William admitted that Rubio had no problems walking or talking that night. William recalled nothing unusual about Rubio's behavior other than that he was in an angry mood and it was clear that Rubio was not getting along with his girlfriend, Candy, that night as they were arguing. On redirect examination, however, William testified that he felt Rubio was intoxicated when he first saw him at Gene's because Rubio was loud and obnoxious. William testified that later that evening after the incident, Rubio came back to Gene's and apologized to William for what had happened.

When asked as to the amount of alcohol consumed that night, William stated that he saw Rubio order a beer for himself and a beer for his girlfriend. William testified that he, himself, had four or five beers at Gene's and by 10:30 p.m. was "relaxed," "feeling pretty good," and maybe "a tad light-headed."

Candy testified that she and Rubio arrived at Gene's sometime after 9 p.m. Upon entering the bar, Candy went to the restroom, and when she came out, Rubio was arguing with Woodhurst over darts. Rubio was poking Woodhurst in the chest with his finger. Candy testified that she told Rubio "to stop arguing and to just knock it off," and after she "found out that he wasn't going to stop, [she] just turned around and left the bar." Rubio did not have a beer in his hands when Candy left or prior to that time. Candy stated that Rubio came out of Gene's "fifteen minutes or more" later.

Candy testified that Rubio changes when he drinks in that he gets "mean," "pushy," and "violent." Candy admitted that on January 13, 1986, she wrote and signed a written statement in which she stated,

among other things, that both she and Rubio were sober. Candy testified that the statement contained what Rubio told her to write; and, while she did not agree with what he was saying, she wrote it because she was "scared of him." Candy admitted that she married Rubio in April 1986 and divorced him two years later. Plaintiffs' attorney represented Candy in her divorce from Rubio. She discussed the Gilman case with him after coming back from court for her final appearance in her divorce case. She gave plaintiffs' attorney a statement regarding the Gilman case in June 1988.

Richard Miller, a member of William's pool team, and William's brother-in-law, testified that Rubio came into Gene's at approximately 9:30 or 9:45 p.m. Rubio started arguing with Woodhurst, who ignored Rubio. Rubio pushed a chair at Steve Schneider, who also ignored Rubio. Rubio then left and did not return to Gene's until about one-half hour later. Miller testified that Rubio "started back in" with Woodhurst again. William went to the restroom, and Miller followed soon after. When Miller came out of the restroom, Rettenberger and William were standing in front of Rubio so Woodhurst could leave. Miller did not see William pick Rubio up, but he saw Rubio pull William's shirt up and push him backwards. William then fell and twisted his knee.

As to intoxication, Miller opined that there was not much doubt that Rubio was intoxicated when he came into Gene's. Miller testified that Rubio gets violent when he has had too much to drink and that Rubio was pretty loud that evening. Rubio had a can of beer in his hand the first time he was at Gene's, but Miller could not recall if Rubio had any beer the second time. Miller testified that he, himself, had "probably five or six" drinks between 6:30 and 9:30 p.m. but was not affected by it.

Kent Rettenberger, also a member of William's pool team, testified that Rubio came into Gene's around 9:15 or 9:20 p.m. Rubio walked up to Woodhurst and started yelling at him, but there was no physical contact. Rubio had words with Gary and John Derickson and kicked a bar stool at Arisio. About 45 minutes later, Rubio came up to Woodhurst and pushed him. They "wrestled around," and Rettenberger stated that he then went between Rubio and Woodhurst as Woodhurst was attempting to get out of Gene's. Rettenberger stated that it was at this point that William came out of the restroom. However, Rettenberger later stated that he had a hold of Rubio when William came out of the restroom and that Woodhurst was half way out the door.

Rettenberger testified that when William came out of the rest-

room, Rubio pushed William and William put his arms out to push back at Rubio. Rubio then pulled William's shirt over his head. Rettenberger did not see William put Rubio in a bear hug or pick him up.

As to intoxication, Rettenberger testified that he did not know if Rubio was intoxicated when he came into Gene's but stated that Rubio was loud and obnoxious. Rettenberger stated that Rubio was served a beer and a mixed drink three to five minutes after he came into Gene's, but Rettenberger did not know if there was alcohol in the mixed drink. Rettenberger did not recall Rubio slurring his speech or having any trouble walking. However, when Rettenberger held Rubio, he came to the opinion that Rubio was intoxicated because Rubio was not normally a troublemaker and he could smell alcohol on Rubio. Rettenberger had no alcohol to drink that night.

At the close of plaintiffs' case, the trial court granted directed verdicts for Harry Martin, d/b/a Pool 13 Supper Club and Pool 13 Supper Club, Inc. Plaintiffs apparently are not appealing this part of the trial court's ruling as they have presented no argument in their post-trial motion or in their briefs to this court in that regard.

In his case in chief, defendant Kessler, d/b/a Gene's Oasis, called Lee Woodhurst. Woodhurst, who is also a member of William's pool team, testified that when he first saw Rubio, Rubio was at the bar and looked "a little outraged or something." Woodhurst asked Rubio twice "[H]ow's it going?" to which Rubio did not reply. Woodhurst then asked Rubio, "[W]ell, what's your problem?" Rubio turned around, swore at Woodhurst, and started to come at Woodhurst. Woodhurst had his back to the pool table. Rubio came up and pinned Woodhurst against the table with his knees and "just held [him] there." Woodhurst pushed Rubio back. Other patrons grabbed Rubio and broke it up. Woodhurst heard the bartender screaming to stop it.

Woodhurst then tried to get out the back door. Rubio lunged for Woodhurst as he was half way out the door. Rubio's lunge pushed Woodhurst out the door. Other patrons grabbed Rubio, and the door slammed. According to Woodhurst the whole incident took place within about 12 minutes because Woodhurst did not notice Rubio until about 12 minutes before he left. Woodhurst did not see William pick Rubio up or set him on a table.

As to intoxication, Woodhurst testified that he did not see Rubio stagger or stumble but that Rubio was in a "very bad" mood and was "spitting and slobbering and making no sense." In answer to a question as to whether Rubio looked any different from other persons Woodhurst had seen who had been very angry, but had not been drinking, Woodhurst stated, "I don't know. If I wasn't in a bar, I wouldn't

have said he was drinking. I don't know."

After defendants had rested, plaintiff made an oral motion dealing "with the fact that provocation is not a defense to an action under the Dram Shop Act." The issue was argued, and the trial court ruled in plaintiff's favor. Defendants then moved for a mistrial based upon the court's ruling because plaintiff failed to bring his motion regarding provocation until all of the evidence had been introduced. The court denied defendants' motions.

After closing arguments were given, the case went to the jury. The jury returned verdicts in favor of both remaining defendants. Plaintiffs filed a post-trial motion on January 25, 1989, which was denied on March 2, 1989. On March 27, 1989, plaintiffs filed their notice of appeal.

We initially address a jurisdictional argument made by defendants on appeal. Defendants argue that plaintiffs' post-trial motion was not timely filed and, therefore, the appellate court lacks jurisdiction to hear the cause even though plaintiffs timely filed their notice of appeal. 107 Ill. 2d R. 303(a).

■■ Section 2–1202(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2–1202(c)) requires a post-trial motion to be filed "within 30 days after the entry of judgment." The record indicates that the jury returned a verdict on December 2, 1988, which was recorded on the trial court's docket. However, the trial court did not enter a written judgment order until January 24, 1989. Defendants contend that the recordation of the jury verdict is the date on which the judgment was entered, and because plaintiffs filed their post-trial motion on January 25, 1989, it was untimely.

■■ Supreme Court Rule 272 is controlling in this case and provides as follows:

> "If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by him, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed. If no such signed written judgment is to be filed, the judge or clerk shall forthwith make a notation of judgment and enter the judgment of record promptly, and the judgment is entered at the time it is entered of record." (107 Ill. 2d R. 272.)

Defendants contend that because the docket entry, which was entered at the time the verdicts were returned, made no requirement that a written judgment be submitted to the judge for his signature, the date of the verdict notation is the controlling date. In support of their contention, defendants cite four cases: *Marotta v. General Motors Corp.*

(1985), 108 Ill. 2d 168; *Davis v. Carbondale Elementary School District No. 95* (1988), 170 Ill. App. 3d 687; *People v. Dickerson* (1984), 129 Ill. App. 3d 59; and *Drulard v. Country Cos.* (1981), 99 Ill. App. 3d 1031.

■ We find defendants' argument unpersuasive. Supreme Court Rule 272 speaks to the "notation of judgment," not to the notation of the jury's verdict. There was no *judgment* entered in the case at bar until January 24, 1989. The cases cited by defendants are distinguishable. *Marotta v. General Motors Corp.* dealt with the refusal of the circuit court to enter judgment on the jury's verdict. In the case at bar, a judgment was clearly entered. The remaining three cases cited by defendants, *Davis v. Carbondale Elementary School District No. 95*, *People v. Dickerson*, and *Drulard v. Country Cos.*, are distinguishable in that a final judgment notation was recorded. Again, in the case at bar, the notation recorded on December 2, 1988, was that of a jury verdict, not a final judgment. The judgment was not ordered until January 24, 1989, which makes plaintiffs' January 25, 1989, post-trial motion timely.

■ Second, we address plaintiffs' argument that the jury verdicts are against the manifest weight of the evidence. In making such a determination, the inquiry on appeal is not whether conclusions other than that reached by the jury are possible; rather, the reviewing court must determine whether the result reached is reasonable on the facts and evidence, and will not disturb the jury's findings unless it is able to say that there is no evidence which fairly tends to support the verdict. *J.F. Equipment, Inc. v. Owatonna Manufacturing Co.* (1986), 143 Ill. App. 3d 208, 216; *Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 932.

As to the dramshop actions, the jury was instructed that plaintiff William had the burden of proving each of the following: (1) that Rubio was intoxicated at the time he pushed William; (2) that defendant sold or gave Rubio intoxicating liquor; (3) that the liquor thus consumed caused the intoxication of Rubio; (4) that Rubio's intoxication was at least one cause of the occurrence in question; and (5) that as a result of the occurrence William suffered injury.

■ Plaintiff contends that at least five witnesses testified that Rubio was intoxicated and that "[t]he record is devoid of any evidence that Rubio was not intoxicated." We disagree. The witnesses that testified as to intoxication were merely rendering their opinions, which the jury was free to reject. The jury is entitled to determine the credibility of the witnesses and the weight to be given to the testimony of each of them. Jurors may take account of any bias a witness may have and the

reasonableness of the witness' testimony considered in light of the evidence in the case.

■ The jury may have taken into account that a number of plaintiff's witnesses were members of his pool team. Their opinions regarding intoxication were based primarily on the fact that Rubio was angry and loud that night and that he usually did not act that way. However, no witness testified that Rubio was stumbling or slurring his words. While the latter two characteristics are certainly not required to prove intoxication, they are nonetheless generally considered when forming an opinion as to intoxication. Additionally, the testimony of Candy Orth, plaintiffs' strongest witness regarding intoxication, is impeachable on the basis that she had given a written statement almost two years before her trial testimony containing exactly the opposite opinion.

Aside from the possibly biased opinion testimony, there was also conflicting evidence as to the amount of alcohol consumed by Rubio. The jury could have found that given the length of time over which the alleged consumption took place, Rubio was not intoxicated at the time of the occurrence.

Even if the jury did find that Rubio was intoxicated at the time of the occurrence, this would not necessarily lead the jury to find against defendants. Plaintiff had the burden of proving the remaining four elements. In part, plaintiff had to prove that Rubio's intoxication was at least one cause of the occurrence in question. As defendant Kessler points out, it would be reasonably conceivable for the jury to find that even a sober man would have responded in the same fashion as Rubio. According to William's testimony, before he got involved, Rubio was arguing with Woodhurst and Rettenberger, with Rettenberger being in the middle. There was no physical violence at this point. William then exited the bathroom, walked a distance of 20 paces over to where the argument was occurring, picked Rubio up and "set" him on a table. When William released Rubio, Rubio shoved William, pulled his shirt over his head, and shoved him again. As a result, William was injured. Given the facts, the jury could have reasonably found that Rubio's intoxication was not a cause of William's injuries because Rubio would have reacted the same way whether he was intoxicated or not. Therefore, the jury's finding for the defendants was not against the manifest weight of the evidence on the dramshop counts.

■ Plaintiffs also contend that the jury's finding for defendant Kessler on the negligence counts was against the manifest weight of the evidence. As to the negligence actions, the jury was instructed, in part, that plaintiffs had the burden of proving each of the following: (1)

that defendant was negligent by failing to keep the tavern premises safe when he knew or should have known of the danger presented to plaintiff by Rubio, in that defendant failed to make any comment to Rubio about his conduct or condition or failed to request Rubio to leave the tavern, failed to call the police, or failed to take any steps to protect William; (2) William was injured; and (3) the conduct of defendant was a proximate cause of the injury.

Defendant argues that the jury could have reasonably concluded from the evidence that defendant neither knew, nor should have known, of the danger presented to William by Rubio. Defendant claims that the incident happened "quickly and was totally unexpected." In support, defendant argues that William admitted immediately prior to the injurious incident, he did not feel that anyone, including himself, was in any danger, nor did he expect any trouble. Various testimonies were given as to the amount of time involved between Rubio kicking the bar stool, Rubio's first confrontation with Woodhurst, and the final incident.

While this court may have found that, given Rubio's conduct, defendant Kessler should have known of the danger presented, there was nonetheless sufficient evidence for the jury to reasonably conclude to the contrary. Thus, the jury's finding on the negligence count was not against the manifest weight of the evidence.

Third, we address plaintiffs' contention that the trial court committed error when it ruled under the evidence that provocation was a defense to the negligence actions. Our review of the record does not indicate that the trial judge made such a ruling. Rather, the judge ruled that the issue of contributory negligence was questionable enough to send to the jury and thus prevented a finding as a matter of law that Williams was not contributorily negligent.

■ The law of contributory negligence has been defined as follows:

> "A plaintiff is contributorily negligent when she acts without that degree of care which a reasonably prudent person would have used for her own safety under like circumstances, and which action is the proximate cause of her injury. [Citation.] Generally, the issue of whether plaintiff exercised due care for her own safety is a question of fact for the jury. [Citation.] The burden of proving oneself free from contributory negligence rests with the plaintiff. [Citation.] In Illinois, contributory negligence is no longer a complete bar to recovery and goes only to diminution of the damage award. [Citation.]
>
> Where a danger is obvious to a person of ordinary intelli-

gence, the law will charge one with knowledge of it. [Citation.] It is incompatible with the exercise of due care for one's own safety and protection to voluntarily expose oneself to danger of which one is aware; ordinary prudent persons do not knowingly place themselves in a position of peril or danger. [Citation.] The mere fact that one has the right to proceed in a certain manner does not justify exposing oneself to a known hazard in the act of proceeding." *Blacconeri v. Aguayo* (1985), 132 Ill. App. 3d 984, 988-89.

 In ruling that the contributory negligence issue should go to the jury, the trial judge commented:

"I have a problem with your reasonable man standard because three people testified that, 'Hey, I didn't want to get involved. I walked away.' That's something for the jury, a factual question, is going to have to decide; was Bill Gilman acting in a reasonable man standard when he intervened? *** I don't think that we're in a position where I can say it is a matter of law that the reasonable man standard absolutely is in favor of Bill Gilman when we have other people on this record testifying that they didn't want to get involved because they didn't want to get hurt."

We find no error in the trial court's ruling, and plaintiffs' argument that any "provocation" by William was abandoned when William released Rubio is without merit given that the concepts of provocation and contributory negligence are separate and distinct doctrines.

Fourth, we address plaintiff's contention that defendants' closing arguments were improper and prejudicial to plaintiff. In support of his contention, plaintiff argues that defendants improperly argued provocation as to the dramshop counts, and secondly, that defendant Kessler improperly commented on the fact that Rubio did not testify.

We will first address the provocation issue. Defendants argue that the trial court erred when it held that provocation is not a defense to a claim under the Dramshop Act (Ill. Rev. Stat. 1987, ch. 43, par. 135), and, therefore, the arguments made during closing were proper. Defendants contend that the trial court erred in its application of *Nelson v. Araiza* (1978), 69 Ill. 2d 534, to the case at bar. The *Nelson* case involved a plaintiff drinking in the company of an alleged intoxicant before an automobile accident. The supreme court had to determine whether the conduct of plaintiff constituted complicity which would bar her recovery in a dramshop action as a matter of law. The court concluded that the evidence adduced at trial raised a question of fact on the issue of complicity but did not require a directed verdict in fa-

vor of defendants. Provocation was not an issue in *Nelson*. Thus, the court's following comment regarding provocation was merely *dicta* and is not controlling:

> "Assertions that one who provokes an attack is barred by complicity [citations] are incompatible with the doctrine. Complicity is not predicated on the plaintiff's contribution to his injury but only upon his contribution to the inebriate's intoxication.
>
> The orderly administration of justice dictates that a clear rule of complicity be distilled. That rule, predicated on the better-reasoned decisions and the concept of the doctrine is this: only one who actively contributes to or procures the intoxication of the inebriate is precluded from recovery." 69 Ill. 2d at 543.

It is not entirely clear how to interpret the court's statement. It appears to propose that provocation is not complicity. This is different than stating that provocation is simply not a defense. Nonetheless, the Appellate Court for the Fifth District, in a dramshop action arising from a tavern brawl, relied upon *Nelson* to hold that provocation is not a defense to a dramshop action in Illinois. *Galyean v. Duncan* (1984), 125 Ill. App. 3d 464, 466.

More recently, however, the Appellate Court for the Third District held to the contrary. (*Akin v. J.R.'s Lounge, Inc.* (1987), 158 Ill. App. 3d 834.) In *Akin*, the plaintiff was injured as a result of an argument between the plaintiff and the intoxicant. Plaintiff brought a dramshop action against the tavern. The jury returned a verdict in the plaintiff's favor, and the trial court entered judgment on the verdict. The defendant tavern appealed, contending that the trial court erred in striking its affirmative defense of provocation. The appellate court agreed and reversed and remanded the cause for retrial.

The court in *Akin* recognized that there are cases going both ways on the issue but held that "the weight of authority, and the better reasoned view as well, is that provocation is an affirmative defense in a dramshop case." (*Akin*, 158 Ill. App. 3d at 837.) The appellate court distinguished *Nelson* by finding that the supreme court did not expressly rule that provocation would be unavailable as a defense in an appropriate case. The *Akin* court cited a long line of precedent recognizing provocation as a defense available to a defendant in dramshop litigation (*Williams v. Franks* (1973), 11 Ill. App. 3d 937; *Tresch v. Nielsen* (1965), 57 Ill. App. 2d 469; *Bowman v. O'Brien* (1940), 303 Ill. App. 630; *Foster v. Lanciault* (1979), 70 Ill. App. 3d 962; *Taylor v. Hughes* (1958), 17 Ill. App. 2d 138; *Martin v. Blackburn* (1942), 312 Ill. App. 549), and noted that the court in *Nelson v. Araiza* did not purport to overrule these earlier decisions, and thus, declined to do so as well.

■ Because we believe that *Akin v. J.R.'s Lounge, Inc.* is the better reasoned view, we find that the trial court erred in the case at bar when it ruled that provocation is not a defense under the Dram-shop Act. As such, defendants' comments in their closing arguments were not improper.

Even if we were to accept the trial court's interpretation of the law as correct, it does not appear that the comments made by defendants were improper. The closing arguments by defendants were substantially similar on this point as they both appear to argue causation, not provocation. Specifically, defendant Kessler argued in pertinent part:

> "The other element in the Dram Shop case is that the intoxi-cation of John Rubio has to cause the injury to Bill Gilman. It didn't. The injury to Bill Gilman was caused because he inter-vened in a situation where he was not needed; not to come to the defense of someone who was in any peril, who restrained that person, who picked him up and, I use this as Mr. Gilman described it. I asked him, 'Did you pick him up like in a bear hug?' He said, 'Yes.' I asked him that a couple of time and he reiterated that, yes, that's the way he picked him up. He came out of the restroom and walked 20 paces, by his own account, over to where Lee Woodhurst and John Rubio were talking and were separated by a 6'2", 230 pound weight lifter. He walked over, picked up John Rubio in a bear hug, turned him around and sat him on the poker table. He restrained him for a few moments while Lee Woodhurst left. Now, Ladies and Gentle-men, I haven't had a drop to drink, but if someone is going to pick me up in a bear hug and set me on that table, I would be mad. I would be outraged and without having anything stronger this morning than coffee, I might very well have jumped off the table and done more than just pick up somebody's shirt and pull it over his head and push him back. That's all John Rubio did. Even then he didn't swing at Bill Gilman. All he did was re-spond naturally to what Bill Gilman had done to him. He got up off that table and went like this and pushed him back and acci-dentally, not because of any misconduct on Rubio's part, but by accident, his knee locked and he fell and his knee moved later-ally. He fell backwards and he had an injury. John Rubio was very sorry about that. He came back in and apologized. He didn't mean to hurt anybody. He didn't in fact hurt Bill Gilman. Bill Gilman hurts himself.
> There is no causation."

Defendant Mills argued:

"Ladies and Gentlemen: Even if you assume that John Rubio was intoxicated and even if you assume that Sue Mills forced alcohol down his throat, Plaintiffs haven't done the proving because Plaintiff's [sic] haven't proved anything Rubio drank caused the bear hug, pushing incident. This is not a case of an innocent party getting run over by a drunk driver. It's not a case of someone sitting at [sic] a bar stool watching television and someone comes out of nowhere and clubs him. I don't know why John Rubio was in an ugly mood that night. Many people testified they had seen him drink before, but had never seen him like that.

I do know the cause of this incident is that if you're asking for trouble, and if you pick someone up that's mad, and you sit him on a table, you know there's going to be trouble.

You remember all those questions you were asked when you were picked? You were asked about someone who tries to break up a fight. That was not the evidence. That's not what happened here. If all the Plaintiff was interested in doing was breaking up somebody, the bear hug would have been enough. Once you already have someone restrained in a bear hug, why did you pick them up especially someone that's smaller and shorter than yourself? You pick them up like a child and set them on a table and then it's not to restrain them. It's to add a little insult."

Plaintiff objected, and the court sustained the objection on the basis that provocation is not a defense to a dramshop cause of action. After two more objections in this regard were sustained, the court terminated the argument of defendant Mills.

■ The jury was instructed that in order for plaintiff to recover under the Dramshop Act, he had to prove the intoxication of John Rubio was at least one cause of the occurrence in question. However, there seems to be a fine line between causation and provocation. The question of causation is a question of fact to be determined by the jury from a consideration of all the evidence (*Caruso v. Kazense* (1974), 20 Ill. App. 3d 695, 697; *Casey v. Burns* (1955), 7 Ill. App. 2d 316, 326), including the actions of William Gilman before he was injured. *Danhof v. Osborne* (1957), 11 Ill. 2d 77.

■ In *Danhof v. Osborne*, our supreme court held that liability under the Dramshop Act did not extend to a case where an assault was prompted by matters independent of the sale of alcoholic beverages. (*Danhof*, 11 Ill. 2d at 81-83.) Similarly, the jury in the case at bar could have found that the sale of alcoholic beverages to John Rubio did

not cause the incident between William and Rubio. Therefore, arguments to that effect were proper.

However, regardless of the propriety of the closing arguments, a reviewing court may not reverse a judgment on these grounds unless the closing argument is "clearly improper and prejudicial." (*Boasiako v. Checker Taxi Co.* (1986), 140 Ill. App. 3d 210, 214.) Given the fine line between causation and provocation, it would be difficult to say that the arguments were clearly improper.

Plaintiff challenges defendant Kessler's closing argument on a second ground: that defendant Kessler improperly commented on the fact that Rubio did not testify. The argument to which plaintiff objected at trial is as follows:

"[T]he Judge is going to tell you right at the outset when he gives you the instructions is that your verdict must be based on the evidence and not on speculation, guess or conjecture. So you have to decide the question of liability and legal responsibility in this case not on what may have happened or might have happened, but on what you heard the witnesses say did happen.

Now, this whole incident took place four years ago and, as Mr. Leemon [counsel for plaintiff] pointed out, there have been differences in the recollection of different witnesses, but there is a series of gaps in the evidence presented here too. We didn't hear anything from John Rubio in this case. We don't know what he said or how he felt or whether he—."

Plaintiff's counsel then objected, and the trial court made the following comment:

"Counsel is aware that John Rubio was directed to appear as a party to this case and the jury should disregard any absence of him from the case because all efforts were made according to statute to have his appearance here."

Defendant's counsel then continued without further objection:

"My only point, Ladies and Gentlemen of the Jury, is we don't know what he had to say. I'm not commenting on anybody's failure to produce him or the fact that he wasn't produced. I am saying we don't know his version for whatever reason. We don't know the Derrers version of this case. There is another gap. We don't know the version of the other 30 people who were, by someone's estimation, in the tavern at the time of this incident. We have a view of what happened only through the eyes of a few witnesses. These witnesses, as you will recall, all gave several accounts of what happened. The Plaintiffs' version of what happened is different substantially from the version of Lee

Woodhurst who was right there, and of Kent Rettenberger who was right there.

You're going to have to assess the credibility of the witnesses who testified and decide which versions are more probably true than not true."

It is generally improper for a defendant to comment upon plaintiff's failure to call a witness who is not under plaintiff's control or who is equally available to the defendant. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 484.) However, it is not improper for counsel to compare and contrast testimony presented and to draw reasonable inferences and conclusions from the evidence and disparities which may be found therein. *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 669; *Lebrecht*, 130 Ill. App. 3d at 484.

■■■ In the case at bar, defendant was not commenting upon plaintiff's failure to call a witness. Rather, the comment was directed toward the disparities and gaps in the testimony presented. Nonetheless, any impropriety of the statement was sufficiently addressed and corrected by the trial court.

Fifth, we consider plaintiffs' contention that the trial court incorrectly permitted defendants to question witnesses as to their drinking of alcohol on November 8, 1984. Plaintiffs argue that evidence of alcoholic consumption is so prejudicial that more than mere drinking must be shown in order to permit such evidence to go to the jury; actual intoxication with impairment of physical or mental capabilities is required. *Wagner v. Zboncak* (1982), 111 Ill. App. 3d 268, 270.

■■■ ■ However, the admissibility of evidence lies within the sound discretion of the trial court. (*People v. Gosse* (1983), 119 Ill. App. 3d 733, 738.) The admission of such irrelevant evidence is ground for reversal only if it results in prejudicing the jury's verdict. (*Gilberto v. Nordtvedt* (1971), 1 Ill. App. 3d 677, 679-80.) After reviewing the record, we find no such prejudice in the case at bar and find any error that may have been committed to be harmless.

■■■ Finally, we consider plaintiffs' contention that certain instructions given to the jury were erroneous and misleading. In their argument of this issue, plaintiffs refer to nine jury instructions. We find that plaintiffs have waived any error regarding all but one of the instructions. Questions on instructions need not be reached on appeal where a post-trial motion was not sufficiently specific to preserve the objection. (*Statler v. Catalano* (1988), 167 Ill. App. 3d 397, 408; *Riley v. Fair & Co., Realtors* (1986), 150 Ill. App. 3d 597, 598-99.) In their post-trial motion, plaintiffs specifically objected to instruction 15 of defendant Kessler and set forth the basis for that objection. However,

as to the remaining instructions, the plaintiffs merely stated that "[t]he Court erred in giving instructions offered by the Defendant, Gene Kessler, and which were objected to by the Plaintiffs." Such a statement is insufficient to preserve the issue on appeal. *Riley*, 150 Ill. App. 3d at 598-99; *Williamson v. Opsahl* (1981), 92 Ill. App. 3d 1087, 1089-90.

As to instruction 15 of defendant Kessler, plaintiffs claimed it was prejudicial to them because it was "misleading[,] causing the jury to believe that it was the precise moment John Rubio pushed the Plaintiff, William L. Gilman Jr., that the duty of Defendant, Gene Kessler, to patrons of his establishment arose."

We note initially that plaintiffs' objection apparently goes to instruction 15A which explains the duty owed by defendant Kessler to William, not to instruction 15, which explains the meaning of proximate cause.

Instruction 15A provides:

"The defendant, Gene Kessler, d/b/a Gene's Oasis, owed the plaintiff, William L. Gilman, Jr., the duty to take affirmative action to protect William L. Gilman, Jr. against misconduct of third persons, if the danger to plaintiff was apparent or the circumstances are such as to put a reasonably prudent person on notice of the probability of danger and if the defendant had the reasonable opportunity to prevent it."

In support of their contention that the jury was misled as to when defendant's duty arose, plaintiffs argue that the jury should have been instructed that defendant had a duty to act when defendant "became aware or should have been aware of the danger to any patron in the tavern, not just the plaintiff, William L. Gilman, Jr." However, plaintiffs cite no authority for their contention that the instruction given was erroneous. In addition, the instruction sufficiently supported plaintiffs' contention that the duty could arise prior to the time William was actually in danger by providing that it could arise if "the circumstances are such as to put a reasonably prudent person on notice of the probability of danger and if the defendant had the reasonable opportunity to prevent it."

For the above-stated reasons, we affirm the judgment of the trial court.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.