In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2059

KEVIN CLANTON,

*Plaintiff-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:15-cv-00124-NJR-RJD — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED JANUARY 14, 2021 — DECIDED DECEMBER 17, 2021

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* This case is on appeal for the second time, from an action brought in the district court by Kevin Clanton under the Federal Tort Claims Act. Clanton alleged that nurse practitioner Denise Jordan, an employee of the U.S. Public Health Service, failed to educate him about his severe hypertension or to monitor its advancement, and as a result of that negligent care his hypertension developed into Stage V kidney disease. As a result, Clanton required dialysis and,

at the age of 35, a kidney transplant, and is expected to endure further cycles of dialysis and another transplant in the future. Following a five-day bench trial, the district court found the United States liable, rejected the government's comparative-negligence argument as to Clanton, and awarded Clanton nearly $30 million in damages.

The United States appealed to this court, arguing that the district court erred in its comparative-negligence analysis and in its assessment of damages. We upheld the damages calculation, but remanded for the court to assess Clanton's comparative negligence under Illinois's reasonable-person standard. *Clanton v. United States*, 943 F.3d 319 (7th Cir. 2020) ("*Clanton I*"). On remand, the court again concluded that comparative negligence was inapplicable in this case, and the government has again appealed.

I.

For context, we briefly recount the facts underlying the Federal Torts Act claim, which are set forth in greater detail in the district court's initial order. After a pre-employment physical exam in June 2008, Clanton was informed that his blood pressure was too high, and that he needed medication to lower it before he could be cleared for work. Clanton sought medical care for it at the Quick Care Clinic, where he was treated by nurse practitioner Denise Jordan. Jordan noted a diagnosis of obesity and hypertension, ordered routine lab work, and directed Clanton to follow up with her at Windsor Health Center the next week.

On June 12, 2008, Clanton had his first office visit with Jordan at the Windsor office. At that appointment, Jordan gave him Clonidine in the office to lower his blood pressure, which

immediately lowered it from 210/170 to 200/130. She also gave him some sample blood pressure medications to take home and told him to come back in a week. From her notes, she appears to have talked to him about healthy eating habits but did not document any other patient education efforts. She signed the form clearing him to return to work.

Clanton did not return for nearly two years, during which time he generally felt fine, with no symptoms of high blood pressure such as blurred vision, headaches or shortness of breath. He returned to Jordan in July 2010, when a routine physical from his employer indicated that his blood pressure was too high and that he needed to seek medical care. He saw Jordan on July 21, 2010, and although the medical records documented that he had not had blood pressure medication during that time, the record does not reflect that Jordan discussed the two-year absence or the risks. Jordan again gave Clonidine to Clanton in the office to lower his blood pressure, which brought it down to some extent. She gave Clanton a prescription for blood pressure medication and told him to return in a week but did not order any lab work.

Clanton returned three weeks later, on August 11, 2010, and he had 10 appointments with her over the ensuing 2 years, at which she checked his blood pressure, administered medication for his high blood pressure readings, and prescribed medications for him to take at home. She noted on some occasions that he was noncompliant, such as an appointment in which she documented that he refused to take a medication she had previously prescribed. He had stopped taking one of the medications that he believed did not work as well as the others, because, as he explained at trial, he still felt bad when taking it. Jordan never discussed with Clanton

whether the medication could be causing the adverse symptoms that he was associating it with, nor did she explain to him that his hypertension could cause such symptoms. She never educated or instructed Clanton about the nature of his hypertension disease, the risks of uncontrolled high blood pressure (including kidney damage), the fact that he was at increased risk for complications because he is African-American, why it was important for him to stay on his medication and return for appointments even when he felt fine, or the potential consequences of sporadic treatment. Throughout that time, Jordan failed to consult with a supervising physician regarding Clanton's care—even on the occasion in which she sent him to the emergency room when he experienced blurred vision and the medication in the office did not sufficiently lower his blood pressure.

At Clanton's appointment with Jordan in July 2011, she ordered lab tests for the first time since his initial visit to her in 2008. Those lab tests revealed signs of kidney disease, but she never saw the results. She admitted that had she seen the results, she would have referred Clanton to a nephrologist. During Clanton's final visit in October 2012, Jordan again ordered lab work, which revealed extensive kidney damage. At this point, Clanton was suffering from Stage IV chronic kidney disease. Neither Jordan nor any one at the clinic communicated those results to Clanton, nor was he referred to a specialist. Two months later, Clanton was taken to the hospital suffering from shortness of breath. His blood pressure was high, and he was finally advised at that time of his severe kidney disease. He was subsequently diagnosed with Stage V kidney disease in February 2013.

Clanton began undergoing hemodialysis in March 2013 and received a kidney transplant in November 2015. Since that time, he has been compliant with his medication regime and his doctor's advice. He would later testify that while he was under Jordan's care, he did not understand the nature of his underlying disease or the risks he faced if he did not take appropriate steps to control his high blood pressure.

As the useful life of a transplanted kidney is ten years, Clanton faces the prospect of returning to dialysis and having one or more additional kidney transplants in the future. The stipulated cost of his past medical care is approximately $2.8 million, and the cost of his future kidney-related medical care is, according to Clanton, estimated to be $14.5 million.

Clanton sued the government for malpractice under the Federal Tort Claims Act, which was the exclusive remedy for his injuries under 42 U.S.C. § 233(a). After a five-day bench trial, the district court found that Jordan was negligent in failing to properly educate Clanton about the nature and potential complications of his disease and the risks of not adhering to a treatment plan, and that as a consequence, Clanton treated his hypertension as a chronic or sporadic condition and only sought treatment when he felt bad or was informed of high blood pressure readings. The court also found that Jordan was negligent in not taking action in response to the 2011 and 2012 lab results showing that Clanton was suffering from kidney disease and in failing to consult with a supervising physician regarding Clanton's care. The district court considered whether Clanton was contributorily negligent for missing follow-up appointments, not taking his medications as prescribed, and failing to check on his lab results, as the government argued, but concluded he was not contributorily

negligent. Clanton was awarded $15.9 million in economic damages and $13.75 million in non-economic damages, for total damages of approximately $29.7 million.

We remanded the case because the court, in making its decision regarding comparative negligence, had determined only whether Clanton's conduct was subjectively reasonable given Clanton's own knowledge, but had not compared Clanton's understanding of his condition to that of a reasonable person in his situation in assessing comparative negligence as is required under Illinois law. *Clanton I*, 943 F.3d at 323. We noted that Clanton was in the position of a person whose caregiver had failed to provide information as to the severity of his condition, but who also had a few external clues that he was seriously unwell, such as two employment-related physicals which showed dangerously high blood pressure. *Id*. We held that "[t]he district court must determine how a reasonable person in the same position would have acted and compare Clanton's behavior to that objective standard of care." *Id*. We rejected the government's challenges to the damage award.

## II.

Therefore, the only issue for the district court on remand was the application of the objective component of Illinois' comparative negligence standard. As we recognized in *Clanton I*, to assess comparative negligence under Illinois law, "[c]ourts must apply the familiar reasonable-person standard, an objective test that asks 'whether plaintiff ... used that degree of care which an ordinarily careful person would have used ... under like circumstances.'" *Clanton I*, 943 F.3d at 323, quoting *McCarthy v. Kunicki*, 823 N.E.2d 1088, 1101 (Ill. App.

Ct. 2005); *Long v. City of New Bos.*, 440 N.E.2d 625, 628 (Ill. 1982).

The district court held that under that reasonable-person standard, Clanton was not comparatively negligent. Moreover, the court held that even if it had found negligence on the part of Clanton, any such negligence was not a contributing cause of his injury because there was no evidence that any of his conduct prior to July 2011 was the cause in fact of his kidney failure or the legal cause of his injuries.

The government's argument on appeal is that, despite giving lip service to the reasonable person standard, the district court's determination was actually once again based on Clanton's subjective knowledge. It argued that the court improperly focused on Clanton's own knowledge of his medical condition, and that the court had no basis under Illinois law for imposing upon the reasonable-person standard a requirement that the provider inform the plaintiff in detail about all aspects of his illness and treatment before finding comparative negligence. In addition, the government asserts that the court's alternative holding—that any negligence by Clanton was not a contributing cause of his injury—was inconsistent with the record.

In considering the government's appeal of the court's decision, it is critical to recognize precisely the procedural context and the limits of the government's challenge. First, the government seeks to overturn a court's decision that followed a five-day bench trial. The court therefore had the opportunity to assess the credibility of the witnesses, and to make fact findings, and its determination proceeds from that factual foundation. We review any challenge to a district court's fact findings under a clearly erroneous standard, and conclusions

of law *de novo. Keller v. United States*, 58 F.3d 1194, 1197 (7th
Cir. 1995).

Tasked with applying the reasonable person standard, the
district court considered evidence that would establish what
Clanton should have known because a reasonable person
would be expected to have such knowledge in similar circum-
stances. The court discussed evidence that was introduced at
trial as to what is generally known about hypertension. That
included testimony from three expert witnesses, establishing:
that patients often feel well when they have high blood pres-
sure, which provides "misinformation" to them as to whether
they are ill; that it is common for people to think that if they
do not feel sick there is no need for treatment; that high blood
pressure is a silent killer, and that patient education is abso-
lutely essential to controlling it especially in a young person
who is facing something that does not produce any symptoms
which would let him know what is happening; and that pa-
tients "routinely do not understand that medication must be
taken daily, even when the patient feels better, and that they
have to be educated on the chronic nature of the disease and
the risks associated with not following a physician's advice."
Dist. Ct. Op. at 6. In addition, the court noted that "experts
also testified at trial that it is common for hypertension pa-
tients to not understand the need to take medications daily
and to return to the doctor regularly." *Id*. Finally, the court
noted that there was no evidence at all in the record indicating
that it was common knowledge in the community that there
is a causal link between uncontrolled hypertension and kid-
ney damage or failure, and that—to the contrary—the gov-
ernment even presented an expert witness contesting the link
between uncontrolled hypertension and kidney damage. *Id.*
at 6–7.

Based on that testimony, the court made the following factual findings:

> Thus, the Court finds that a reasonable person would not know or understand the importance of taking medication regularly, monitoring one's blood pressure, and returning for regular office visits even when he or she feels well. And there is certainly nothing in the record that shows a reasonable person, unless specifically educated or otherwise informed, would know that uncontrolled hypertension may be causing harm even when he or she feels well and could lead to serious, irreversible kidney damage if left untreated.

Dist. Ct. Op. at 7.

Notably, the government presents no challenge to those fact findings. It never argues that the expert testimony was insufficient to support the court's findings, or that the findings were otherwise clearly erroneous. Instead, the government argues only that the district court failed to apply the reasonable-person standard at all, but rather relied once again on Clanton's subjective knowledge in determining that there was no comparative negligence. Because no challenge is raised as to those factual findings, we do not review them at all. See, e.g., *United States v. Vines*, 9 F.4th 500, 512 (7th Cir. 2021) (we will not manufacture challenges to determinations by the district court that are not raised by the plaintiff on appeal); *Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020) ("An appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those

rulings were wrong."). The court's analysis of what a reasonable person would do, therefore, was made in the context of those fact findings as to what a reasonable person would understand as to the illness, its dangers, and its potential for progression.

In addition to considering what a reasonable person would understand as to hypertension generally, the court also considered how the additional external clues that he was seriously ill which we identified in our opinion remanding the case, such as two employment-related physicals which showed dangerously high blood pressure, would impact how a reasonable person in the same situation would have acted. The court conducted that analysis against the backdrop of its uncontested findings set forth above.

First, the court considered what a reasonable person would understand when informed, after each of two employment-related physicals separated by two years, that his blood pressure was too high and that he needed medication to lower it. The court held that a reasonable person would then take the action that the employer required—which is to go to a healthcare provider to get medication to lower his blood pressure so that he could return to work. *Id*. at 8. And, as the court pointed out, that is precisely what Clanton did. He went to Jordan after the initial employer notification, and followed up with another appointment within a week, at which time Jordan gave him medication to lower his blood pressure and signed the form that allowed him to return to work. Given the court's findings that a reasonable person would not be aware that asymptomatic high blood pressure can cause damage, nor of the importance of taking medication regularly, monitoring one's blood pressure, and returning for regular office

visits even when he or she feels well, the finding that a reasonable employee would act as Clanton did is supported by that evidence. The court concluded that "from these two failed work-related physicals, a reasonable person would only have learned that you cannot pass a work physical with a high blood pressure reading until you see a healthcare provider and take a single or short-term dose of medications given to you by that healthcare provider." *Id*. The court further found that "[t]here is nothing from these facts that would tell a reasonable person that hypertension is a chronic health condition with serious consequences if it is not consistently monitored and treated on a daily basis for his lifetime." *Id*. The court therefore rejected the argument that Clanton "should have known" that he was seriously unwell based on those work physicals. And it reached the same conclusion with respect to the 2008 trip to the emergency room. *Id*. The court noted that Clanton sought treatment because of a severe headache, that he was informed that he had high blood pressure and given medicine, and he then felt better. *Id*. From that incident, the court found that a reasonable person would only have learned that a one-time dose of medicine would resolve the symptoms of high blood pressure, and that nothing in that incident would inform him that he had a serious, chronic condition that could cause kidney damage. *Id*. at 8–9.

Illinois courts have repeatedly recognized that the determination of due care in a comparative negligence claim is a factual determination, left to the trier of fact. See *Gilman v. Kessler*, 548 N.E.2d 1371, 1378 (Ill. App. Ct. 1989) (holding that "[g]enerally, the issue of whether plaintiff exercised due care for her own safety is a question of fact for the jury"), quoting *Blacconeri v. Aguayo*, 478 N.E.2d 546, 550 (Ill. App. Ct. 1985); *Gruidl v. Schell*, 519 N.E.2d 963, 967 (Ill. App. Ct. 1988) ("The

question of contributory negligence is ordinarily a question of fact for the jury. If there is any evidence of contributory negligence on the part of the plaintiff, a question of fact is presented that must be left to the jury for determination.") The court made those fact findings based on the evidence in the record, and the government does not challenge them. Instead, the government argues that the district court never applied the reasonable-person standard, but once again found the absence of comparative negligence based solely on Clanton's subjective understanding. In addition, the government asserts that the court erroneously held that comparative negligence can never be found unless the provider first educates the individual as to the disease, its risks, and the treatments needed for it.

The government characterizes that analysis as a subjective analysis, not an objective one, but that is not a fair characterization. The court considered not only what Clanton knew or would conclude as a result of his medical interactions, but what a reasonable person would conclude. It considered whether those incidents would have alerted a reasonable person to the chronic nature of the illness and the need for consistent action to address it, even if Clanton himself did not draw those conclusions. But based upon the court's initial fact determinations, a reasonable person would not have any knowledge of the long-term risks posed by hypertension. Therefore, the base of knowledge for the hypothetical "reasonable person" is limited to that information which is apparent from the medical treatment or is otherwise conveyed to them, as by the medical practitioners or other means.

In its earlier opinion, the district court had held that Clanton did not understand the seriousness of his blood pressure

levels, the chronic nature of his condition, or the conse-
quences of not controlling it, and therefore he treated his hy-
pertension as one would treat an acute or episodic condition,
like a headache or a sinus infection. The court has now found
that a reasonable person would not understand that high
blood pressure was a serious, chronic condition, and in that
context a reasonable person would seek medical treatment
when symptoms flared—as one would do for a condition that
is acute or episodic rather than chronic and progressive. It is
the difference between the treatment "as needed" that a rea-
sonable person would be expected to pursue for occasional
headaches, as opposed to the close monitoring one would ex-
pect if that headache evidenced a growing brain tumor. As we
discussed, those findings are based on expert testimony, and
are not challenged here. With those findings that a reasonable
person would also lack the knowledge as to the nature of that
condition, its risks, and the need for continual treatment for
it, the court's conclusion that Clanton's actions were con-
sistent with that which a reasonable person would have taken
is based on an application of the reasonable person standard,
and not on his subjective knowledge. The government's only
challenge in this case is that the court did not apply the objec-
tive standard, but the court's analysis refutes that. We empha-
size that the holding here is an extremely narrow one, dictated
by the government's tailored legal challenge and the uncon-
tested factual findings below.

As additional evidence that the court did not adhere to the
reasonable-person standard, the government argues that the
court's analysis conflicts with Illinois cases applying that
standard. Specifically, the government asserts that Jordan's
failure to provide Clanton information as to his disease has
no application to Clanton's contributory negligence, and that

Illinois cases hold that a patient's failure to follow medical advice constitutes contributory negligence. The obviousness of the risk, and whether a reasonable person would perceive a danger, however, has always been relevant to the determination as to whether the person's actions constituted due care. See, e.g., *Gilman*, 548 N.E.2d 1378, quoting *Blacconeri*, 478 N.E.2d 546 at 550 ("Where a danger is obvious to a person of ordinary intelligence, the law will charge one with knowledge of it. … It is incompatible with the exercise of due care for one's own safety and protection to voluntarily expose oneself to danger of which one is aware; ordinary prudent persons do not knowingly place themselves in a position of peril or danger"); *Long v. City of New Bos.*, 440 N.E.2d 625, 628–29 (Ill. 1982) (noting that the "[f]ailure to observe and avoid danger which is obvious to a person of ordinary intelligence has been held to be contributory negligence in numerous cases," and examining whether a danger "should have been apparent" to the plaintiff). Consider an example: if a pedestrian were crossing a street, a reasonable pedestrian would be expected to appreciate the danger posed by traffic, and to take action, such as looking both ways before proceeding, to ensure that the risk was avoided. If that pedestrian while crossing the street were then struck by a plane, however, a court would not find contributory negligence in the failure of the pedestrian to also look up before proceeding. Although the damage might have been avoided had the pedestrian looked up before proceeding, a reasonable person crossing a street would not perceive himself to be in danger from a plane, even if planes were regularly flying overhead, and thus would not be expected to look up in the exercise of reasonable care. On the other hand, if the pedestrian were crossing a runway, the risk of such a

calamity would be one that a reasonable person should recognize, and in that case the failure to also scan the skies could constitute a lack of due care. The nature of the risk, and whether a reasonable person would be aware of it, are relevant considerations in the objective analysis as to whether the actions were negligent.

Here, the district court found that a reasonable person would not perceive high blood pressure as a chronic illness, with the risk of progressive damage to the kidneys, as opposed to an acute illness to be treated as symptoms required. The damage that occurred from the "silent killer" was not one that, absent education, a reasonable person would foresee. So, like a pedestrian proceeding across a street, the patient would be expected to address the illness as symptoms indicated a flare-up to avoid adverse consequences from those symptoms, but the progressive damage to the kidneys while asymptomatic for a person in that situation would not be a risk that he would perceive, and therefore not one that he would be expected to act to forestall.

The district court's factual findings establish that the risk of long-term damage even in the absence of symptoms is not one that a reasonable person would perceive as to this particular disease. For many diseases, the nature of the disease and its ramifications will be a matter of general knowledge, such that a reasonable person would be expected to perceive the risk to his health and to take action appropriate to address that risk even absent education from a medical practitioner. But in this case, the court found that the expert testimony established that there is a widespread lack of knowledge as to hypertension, its chronic nature, and the health danger that it

poses unrelated to any symptoms, and in such an environ-
ment in which the danger is not perceived by the general pub-
lic, a reasonable person would not be expected to take action
to avoid it.

And the government recognizes as much in its own argu-
ment. In arguing that the court "provided no legal basis for its
belief that it is totally reasonable for people to ignore medical
advice, stop taking medications, and skip medical appoint-
ments for an extended period, so long as they have not been
explicitly informed in detail about all of the possible conse-
quences of failing to follow that advice," the government then
proceeds:

> It is not as if high blood pressure is some rare or
> arcane medical issue that no laymen have ever
> heard of. Reasonable people know about it, and
> reasonable people who are diagnosed with it
> take reasonable precautions—like, for example,
> following medical advice, keeping appoint-
> ments with medical providers, and taking their
> prescribed medications.

Appellant's Brief at 23. Even the government, then, recog-
nizes that the knowledge of the layperson as to the disease
impacts the reasonable person analysis; and although the
government states that "[i]t is not as if high blood pressure is
some rare or arcane medical issue," the district court made
fact findings that hypertension is an arcane issue that is not
understood by the average person absent education. And the
government does not contest those findings or the testimony
underlying them, and provides no cites or support for its off-
hand, contrary characterization of the disease. The govern-

ment could have argued that the fact findings were clearly erroneous, and that patients possess a sufficient awareness of hypertension to understand the need for regular medication and follow-up. But the government chose not to bring such an argument, and any legal challenge therefore assumes the facts found by the district court.

In repeatedly stating that reasonable people follow medical advice and keep appointments, the government fails to acknowledge the court's findings that reasonable people would not understand the need to treat the illness when asymptomatic. It is the difference between what is reasonable behavior for an acute, episodic condition and a chronic one. Clanton took the medication when he had reason to believe it was needed, whether because it was necessary to be given the clean bill of health for a return to work or because he experienced headaches and other symptoms that would alert him to the need for treatment. And once he received the work clearance or the adverse symptom was alleviated, he sought no further treatment, as is typical and expected for an acute condition that is treated on an as-necessary basis. And in fact, even when he did follow up with additional appointments for his disease, on numerous occasions he was instructed merely to return to the clinic "as needed," which would simply reinforce the perception that his need for medical care was tied to his experience of symptoms. The noncompliance decried by the government is an inadequate and unreasonable response to a chronic condition of which a reasonable person is or should be aware, but the court explicitly found that a reasonable person would not be aware of the chronic and dangerous nature of hypertension absent education, which did not occur here. The court, then, did not hold, as the government asserts,

that comparative negligence will never be found if the medical practitioner fails to inform the patient about his disease, and its consideration of the information provided by Jordan does not mean the court was applying a subjective standard rather than a reasonable-person analysis.

The holding in this case is circumscribed by the uncontested factual findings by the court as to the disease, the general public's common understanding of it, and the knowledge that a reasonable person would possess in the absence of education by a medical practitioner. The holding is therefore limited to the context of those narrow factual findings. As such, it does not apply beyond the contours of this case. A district court in another case, faced with different expert testimony, could well find that a reasonable person had a more extensive knowledge of hypertension than the court found in this case, and therefore that a reasonable person would have an awareness of the risk and would be expected to act in a way to avoid it. But here, the court was presented with evidence that people generally have no knowledge of hypertension and its risk, and we do not review that determination because the government does not claim that it is clearly erroneous. As is often the case where the reasonable-person standard is applied, the holding here is specific to the facts presented and the findings that the trier of fact reached. See *Gilman*, 548 N.E.2d at 1378; *Gruidl*, 519 N.E.2d at 967.

Finally, the government argues that the court did not properly apply the reasonable-person standard because its holding is inconsistent with Illinois cases that have held that noncompliance with medical advice constitutes contributory negligence without requiring a showing that the provider first explained the consequences of failure to follow that advice.

See *Krklus v. Stanley*, 833 N.E.2d 952, 961 (Ill. App. Ct. 2005); *Pantaleo v. Our Lady of Resurrection Med. Ctr.*, 696 N.E.2d 717, 728 (Ill. App. Ct. 1998); *Gruidl*, 519 N.E.2d at 967. But those Illinois cases cited by the government do not undermine the district court's holding. Those cases do not hold that noncompliance with medical instructions is always contributory negligence; nor do they hold that noncompliance is never contributory negligence. Rather, the Illinois cases relied upon by the government recognize that comparative negligence is an issue to be decided by the trier of fact. The issue before the court in each of those cases was whether the court properly presented the issue of comparative negligence to the jury.[1] Those courts merely held that the facts were sufficient to allow a jury to determine whether the plaintiff's actions were negligent, and therefore that the jury's finding of comparative negligence was not against the manifest weight of the evidence. See, e.g., *Gruidl*, 519 N.E.2d at 967 (holding that "[i]f there is any evidence of contributory negligence on the part of the plaintiff, a question of fact is presented that must be left to the jury for determination."); *Pantaleo*, 696 N.E.2d at 726 ("we will not upset the verdict 'merely because the jury could have drawn different inferences and conclusions from conflicting testimony'

---

[1] The government points as well to *Ford-Sholebo v. United States*, 980 F. Supp. 2d 917, 997–98 (N.D. Ill. 2013), which did not involve a review of a jury verdict. In that case, the judge found comparative negligence after a trial, based on Solebo's regular refusal to take the seizure medicine administered on a daily basis by the prison official. This case presents no conflict for the same reasons as the other cases. The district court in the present case did not hold that noncompliance can *never* constitute comparative negligence, and the factual findings as to what a reasonable person would know are absent in *Ford-Sholebo* and are dispositive—and unchallenged—here.

presented at trial"); *Krklus*, 833 N.E.2d 952, 961, 964 (holding that "the question of whether comparative negligence is appropriate in a particular medical malpractice case must be decided on a case-by-case basis" and the court did not err in instructing the jury that it could consider comparative negligence, but noting that "our conclusion is firmly rooted in the specific facts of the case at bar"). The cases certainly do not hold that those facts *require* a finding of comparative negligence. The decision to submit the issue to the trier of fact is merely a determination that the facts in those cases would support a decision either way, which is why the issue was neither decided as a matter of law prior to trial, nor overturned post-trial. The court in this case similarly allowed the issue to go to trial, although in this case the trier of fact was the judge, not a jury. And after hearing the evidence, the court determined that the facts did not demonstrate negligence on the part of the plaintiff, just as the jury in the cases cited by the government held that the facts demonstrated negligence. The court in the present case did not hold that, in all cases, a medical provider must provide information as to a person's disease and its risks and treatments in order for noncompliance to constitute comparative negligence. As was true for the Illinois cases cited by the government, the district court's decision in this case was tied to the facts in this case, and in particular to the factual findings as to what a reasonable person would understand as to this particular disease absent any education from a medical provider. The district court's analysis is therefore consistent with the application of the reasonable person standard in those cases, and there is no conflict with those decisions.

### III.

In summary, the district court did not base its decision on Clanton's subjective understanding. The court made findings as to what an objectively reasonable person would understand as to hypertension and found that a reasonable person would not understand the potential for damage in the absence of any symptoms, and therefore would not understand the need to take medication or see a medical provider when asymptomatic. The government does not contest those findings by the court, and therefore, we accept them as true and express no opinion at all as to those findings. Based on those findings, the court held that Clanton's actions were not inconsistent with the due care that would be expected of a reasonable person. Whether the fact findings are supportable, and whether that conclusion as to due care is supportable, are not issues before us now. The only issue raised by the government is whether the court continued to apply the subjective test on remand, or whether the court analyzed comparative negligence under the proper reasonable-person standard which we instructed the court to apply on remand. The district court's order reveals that it properly identified the standard and applied it, and the government has not demonstrated reversible error. Because we affirm on this ground, we need not consider the court's alternative argument that any comparative negligence could not be considered a "substantial cause" of Clanton's injury.

The decision of the district court is AFFIRMED.