St. Eve, Circuit Judge.
Kreg Therapeutics, Inc., a medical-supply company, contracted with VitalGo, Inc., maker of the Total Lift Bed® (or the "bed"), for exclusive distribution rights in several markets. A year and a half later, the arrangement soured. VitalGo told Kreg that it had not made the minimum-purchase commitments required by the contract for Kreg to keep its exclusivity. Kreg thought VitalGo was wrong on the facts and the contract's requirements. This lawsuit ensued.
In the district court, VitalGo did not make a strong showing in defending its case. The district court ruled during the *410 summary-judgment stage that VitalGo breached the agreement, and the court treated that ruling as established for the case. That left only Kreg's damages. The case went to a bench trial, despite an eleventh-hour request from VitalGo to have it dismissed on pleading grounds. After the bench trial, the district court ordered VitalGo to pay Kreg a little over $1,000,000 in lost-asset damages and prejudgment interest.
VitalGo appeals, arguing that the district court made a host of reversible errors. We see none and affirm.
I. Background
A. Factual History
The Total Lift Bed, as the name suggests, can incline to a near 90-degree angle with the occupant harnessed and upright. Hospitals use the beds when treating obese and elderly patients. And the beds are expensive, with some models running more than $10,000. Kreg is in the business of selling and renting specialty medical equipment to medical providers, and it sought a distribution arrangement with VitalGo for the beds.
The two parties entered into a written agreement in December 2009. The agreement conferred exclusive distribution rights of the Total Lift Bed to Kreg in several geographic regions: Indiana, Illinois, Wisconsin, and Atlanta, Georgia (the "original territories"). Those rights lasted until January 31, 2011, but paragraph 1.B. of the agreement contemplated their extension. If Kreg made a minimum-purchase commitment of $200,000 in each of the four territories before January 31, 2011, then paragraph 1.B. extended exclusivity for another year. The agreement also contained an in-writing clause. Per paragraph 23, any "notice or communication required or permitted" under the agreement "shall be made in writing and shall be sent by registered mail, return receipt requested."
In April 2010, a few months into the agreement, Kreg and VitalGo added an amendment to it. The amendment granted Kreg exclusivity in several additional territories, including parts of Florida, New Jersey, and St. Louis, Missouri (the "additional territories"), through May 2012. The amendment did not make clear whether that date applied to the additional territories only or whether it covered the original territories as well.
Kreg and VitalGo went about their business uneventfully until mid-2011. On June 2, 2011, Ohad Paz, VitalGo's CEO and Managing Director, emailed Craig Poulos, Kreg's President, complaining that Kreg had not performed under the contracts as required to maintain exclusivity. The email read: "Despite our conversation in January 2011 and the different options we spoke about, you did not make any commitment for purchase of our products for 2011, as you should have, in order to keep your exclusivity." Poulos responded a few days later that Kreg was "willing to agree to commit to future minimum purchases in 2011," but that it needed updates on design problems Kreg saw in the beds first. About a week later, on June 15, 2011, VitalGo and one of Kreg's competitors, RecoverCare, issued a press release announcing a nationwide exclusivity arrangement for the Total Lift Bed. They entered a multiyear agreement in August 2011.
In September 2011, Kreg requested five new beds from VitalGo. VitalGo refused to fill the order. Kreg responded by filing this lawsuit.
B. Procedural History
Kreg's complaint brought one cause of action-breach of contract-and it sought only injunctive relief. On the day it filed *411 the complaint, Kreg also moved the district court for a temporary restraining order. After a hearing, the district court denied the request and concluded that Kreg had not shown irreparable harm caused by VitalGo's alleged breach. VitalGo filed counterclaims, including for breach of contract, and the case entered discovery.
In March 2012, the parties cross-moved for summary judgment. Kreg argued that there was no genuine issue of material fact relating to its breach-of-contract claim and that injunctive relief was warranted. VitalGo, meanwhile, contended that Kreg had not shown irreparable harm or performance under the contracts.[1] Those motions, like all summary-judgment motions filed in the Northern District of Illinois, were subject to Local Rule 56.1. Pursuant to Local Rule 56.1(a), both Kreg and VitalGo filed a statement of uncontested facts with their motions. But there ended VitalGo's compliance with the rule. VitalGo did not support its statement of facts with contemporaneously filed record evidence, as Local Rule 56.1(a) requires (and as Kreg did). Nor did VitalGo file a response to the opposition's statement of facts, as Local Rule 56.1(b) requires (and as Kreg did). VitalGo also did not file a response to Kreg's summary-judgment motion. The district court tried twice, unsuccessfully, to alert VitalGo's counsel to the filing failures.
In March 2013, the district court issued a thorough opinion ruling on the cross motions. The court addressed at the outset VitalGo's noncompliance with Local Rule 56.1. According to well-established Seventh Circuit law, that noncompliance meant that the district court could exercise its discretion to accept Kreg's statements of fact as undisputed. See, e.g. , Curtis v. Costco Wholesale Corp. , 807 F.3d 215, 219 (7th Cir. 2015). The court did so, "to the extent" the facts were "supported by admissible and docketed evidence."
On the merits, and applying New York law, the district court first decided that the agreement and the amendment were two distinct contracts. The agreement covered exclusivity obligations with respect to the original territories; the amendment governed the additional territories. As to the original territories, the district court ruled that Kreg had performed under the agreement and that VitalGo had breached it. Kreg's undisputed evidence showed that Poulos and Paz met in Chicago in December 2010-before the original territories' commitment date of January 2011-and there Poulos orally agreed to purchase $800,000 worth of beds from VitalGo. That constituted Kreg's performance under the agreement, according to the district court. That Kreg's commitment was not in writing did not doom its claim, the court ruled, because the agreement did not require all communications to be made in writing, paragraph 23 notwithstanding.
The district court therefore decided that, even viewing the facts in the light most favorable to VitalGo, Kreg had established the first three elements of a breach of contract: the existence of a contract, its performance, and VitalGo's breach. But it found Kreg's case lacking with respect to the fourth element: damages. See, e.g. , Johnson v. Nextel Commc'ns, Inc. , 660 F.3d 131, 142 (2d Cir. 2011) (identifying the four elements of a breach-of-contract claim under New York law). Kreg had claimed losses from the breach, but it had not shown that the parties foresaw such *412 losses when they made the agreement-as required to collect consequential damages under New York law. See, e.g. , Awards.com, LLC v. Kinko's, Inc. , 42 A.D.3d 178, 834 N.Y.S.2d 147, 152 (2007). Kreg had also not established irreparable harm, a requirement for the injunctive relief Kreg requested. Yet not all was lost for Kreg, the district court explained. Under Federal Rule of Civil Procedure 54(c), a party can obtain any form of relief to which it is entitled-like monetary damages-even if the party did not expressly seek it.
As to the additional territories, the district court saw no evidence of actual commitments from Kreg. The June 2011 emails evidenced only a willingness to commit. The district court thus granted in part and denied in part VitalGo's motion and denied Kreg's motion.
The court held a status hearing the next month to chart the case's course. VitalGo's counsel failed to attend. Kreg's counsel told the court that it read the summary-judgment opinion as, in part, a ruling under Federal Rule of Civil Procedure 56(g), which permits a court to "enter an order stating any material fact ... that is not genuinely in dispute and treating the fact as established in the case." Kreg's counsel added that, after the opinion, "the only thing left" to address was damages with respect to the original territories. The district court agreed and set a briefing schedule for a second summary-judgment motion on damages.
A couple months later, Kreg filed its second summary-judgment motion. VitalGo replaced its counsel before responding, and the court gave new counsel leave to take discovery on Kreg's damages. When VitalGo did respond-this time in compliance with Rule 56.1-it addressed Kreg's damages argument. But it also contended that Rule 56(g) should not apply, and that the issues of performance and breach should still be on the table. The district court, in ruling on the second motion, admitted that it should have cited Rule 56(g) in its first opinion, but it affirmed that its previous opinion established performance and breach as undisputed facts of the case. The court, however, again concluded that material issues of fact existed with respect to Kreg's damages.
The court put the litigation on pause for about two years, after VitalGo entered bankruptcy in late 2014. When it emerged, the district court set a bench trial on the issue of damages for September 2016. A couple weeks before trial, VitalGo moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(c) and alternatively Rule 12(h)(2)(c), contending that Kreg had never pleaded damages. Kreg responded by filing a Rule 15 motion to amend its complaint to add damages allegations. The district court took those motions under advisement pending trial.
Trial lasted two days, and the parties' principals and damages experts testified. In September 2017, the district court issued another thorough opinion resolving the case. The court first granted Kreg's motion for leave to amend, mooting VitalGo's pending motion to dismiss. It then made detailed factual findings and decided damages. The district court determined that Kreg was entitled to consequential damages because VitalGo should have foreseen that its breach would cause Kreg to lose its exclusive business segment-a lost asset, according to the court. Turning to the amount of damages, the district court found Kreg's expert persuasive and used his assumptions with certain tweaks. It awarded $642,610 in lost-asset damages plus $364,593 in prejudgment interest to Kreg. This appeal followed.
II. Discussion
VitalGo makes many arguments on appeal. The through line is that the district *413 court erred with each step it took in finding VitalGo liable, from the first summary-judgment decision through the posttrial opinion. We will take VitalGo's arguments in two sets-those related to the summary-judgment decisions and those concerning the posttrial rulings-and address them in turn.
A. VitalGo's Challenges to the Summary-Judgment Decisions
VitalGo contends that the district court first erred in concluding that the agreement allowed Kreg to make commitments orally. From that error, VitalGo says, the district court made more: deciding that there was no issue of fact with respect to which party breached; entering a Rule 56(g) order; and denying VitalGo's summary-judgment motion. We, however, see neither an error of law nor an abuse of discretion in the district court's decisions.
1. The In-Writing Requirement
Paragraph 23 of the agreement reads: "Any notice or communication required or permitted hereunder ... shall be in writing and shall be sent by registered mail, return receipt requested, postage prepaid." According to VitalGo, this paragraph unambiguously requires any communication-including paragraph 1.B.'s minimum-purchase commitments-to be made in writing. Because there was no evidence Kreg did so, VitalGo argues, the district court should have granted VitalGo, not Kreg, summary judgment. The parties agree that New York law governs the agreement's interpretation.
Under New York law, contract interpretation should give effect to the parties' intent "as revealed by the language of their agreement." Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co. , 773 F.3d 110, 113-14 (2d Cir. 2014). It follows that we start by asking whether the contract is ambiguous, a question of law. See U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L. , 823 F.3d 146, 149 (2d Cir. 2016) ; JA Apparel Corp. v. Abboud , 568 F.3d 390, 396-97 (2d Cir. 2009). New York law provides that a contract term is ambiguous if it is reasonably subject to more than one meaning. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp. , 595 F.3d 458, 466 (2d Cir. 2010) ; Morgan Stanley Grp. Inc. v. New England Ins. Co. , 225 F.3d 270, 275 (2d Cir. 2000).
Paragraph 23 fits that definition. It applies to "any ... communication" made under the agreement. Read literally and absolutely, those words cover the "communicating" of a minimum-purchase commitment. But one might reasonably read paragraph 23 more narrowly. For one, an absolute reading would limit the parties to registered mail for the bulk of their discussions-almost certainly not what two modern-day business partners intended. See, e.g. , Duane Reade, Inc. v. Cardtronics, LP , 54 A.D.3d 137, 863 N.Y.S.2d 14, 18-19 (2008) (in deciding whether a contract is ambiguous, courts should not disregard "common sense ... in favor of formalistic literalism"). What is more, paragraph 23 references undefined "notices" and "communications," but those terms are not included in paragraph 1.B.-despite "notices" appearing elsewhere in the agreement. Likewise, paragraph 1.B. makes no mention of the need for a "written notice" or that the commitment must be made "in writing"-despite at least six other provisions containing those terms.
So paragraph 23's reach is ambiguous. Typically, if a contract is ambiguous, its meaning is a question of fact not suited for summary disposition. See, e.g. , Utica Mut. Ins. Co. v. Clearwater Ins. Co. , 906 F.3d 12, 17 (2d Cir. 2018). But not always. Courts can resolve ambiguities as *414 a matter of law if the record is "so one-sided that no reasonable person could decide the contrary." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc. , 232 F.3d 153, 158 (2d Cir. 2000) (Sotomayor, J.). That is the kind of record we have here.
Earlier we noted that the parties could not have intended paragraph 23 to be absolute. The record demonstrates as much. It shows scores of communications between the parties made out of compliance with paragraph 23's literal meaning, either by email, regular mail, or in person. And no wonder. Countless communications follow the formation of an agreement like Kreg and VitalGo's, covering order requests, maintenance needs, and billing inquiries (to name a few). To require the companies to send every communication via registered mail is commercially unreasonable, if not absurd in the twenty-first century. See, e.g. , Greenwich Capital Fin. Prod., Inc. v. Negrin , 74 A.D.3d 413, 903 N.Y.S.2d 346, 348 (2010) ("[A] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."). Indeed, neither party has pointed us to record evidence showing that they ever used registered mail. Perhaps the parties did for communications relating to the provisions that require "written notice" or delivery "in writing," but there is no evidence that they intended paragraph 23 to stretch beyond those provisions.
New York law frowns upon imposing contractual requirements on sophisticated parties who have not made those requirements explicit in their contract. Utica Mut. Ins. , 906 F.3d at 24 (citing Glob. Reinsurance Corp. of Am. v. Century Indem. Co. , 30 N.Y.3d 508, 91 N.E.3d 1186, 1193 (2017) ). The parties here did not make clear that they intended paragraph 1.B. to be subject to paragraph 23, and the record can be read only to say the opposite. The district court got it right-the agreement does not require minimum-purchase commitments to follow paragraph 23.
2. Performance and Breach
VitalGo next challenges the district court's decisions on Kreg's performance and VitalGo's breach. During the first round of summary-judgment briefing, Kreg offered evidence showing that Poulos made the minimum-purchase commitment for the original territories in December 2010. The district court deemed this fact undisputed because VitalGo failed to contest it under Local Rule 56.1. With that fact undisputed, another conclusion had to follow: VitalGo breached the agreement by terminating exclusivity in June 2011 and by failing to deliver beds in September 2011.
It is a nonstarter to argue that the district court erred in deeming the commitment an undisputed fact. We have "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." Flint v. City of Belvidere , 791 F.3d 764, 767 (7th Cir. 2015) (collecting cases). And we hasten to do the same here, especially in light of the court's repeated efforts to alert VitalGo, a sophisticated company represented by counsel, to its filing failures. VitalGo, however, tries a different tack, arguing that the district court erred by overlooking conflicting evidence from earlier in the case, most notably from interrogatories and the TRO briefing and hearing. But that is essentially the same meritless argument.
Local Rule 56.1 does not provide an exception for cases in which some conflicting evidence exists in the periphery, evidence that the district court should have *415 (somehow) clued itself to. That would be self-defeating. The rule aims to make summary-judgment decisionmaking manageable for courts-an acute concern in complex, drawn-out disputes like this one, where theories can shift and reams of evidence can accumulate. See, e.g. , Curtis , 807 F.3d at 219 ; Waldridge v. Am. Hoechst Corp. , 24 F.3d 918, 920-22 (7th Cir. 1994). That is why we allow strict enforcement of the local rule, recognizing that it is "not the duty of the district court to scour the record in search of material factual disputes." Roger Whitmore's Auto. Servs., Inc. v. Lake Cty., Illinois , 424 F.3d 659, 664 n.2 (7th Cir. 2005) ; see also Cracco v. Vitran Exp., Inc. , 559 F.3d 625, 632 (7th Cir. 2009) ; FTC v. Bay Area Bus. Council, Inc. , 423 F.3d 627, 633 (7th Cir. 2005). VitalGo's contrary argument, that the district court should have combed the docket sheet and earlier briefing to identify evidence that VitalGo itself failed to bring to the court's attention, wrongly attempts to foist its obligations on the court.
3. The Rule 56(g) Order
VitalGo also argues that, even if the district court was correct on performance and breach during the first round of summary-judgment briefing, it erred in entering a Rule 56(g) order on those issues. Rule 56(g) states: "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact ... that is not genuinely in dispute and treating the fact as established in the case." Because Rule 56(g) speaks of what a court "may" do, we review for an abuse of discretion.
According to VitalGo, because Kreg did not make a showing on one of the breach-of-contract elements (damages), the burden to show an issue of fact never shifted to VitalGo; and because the burden never shifted to VitalGo, it cannot be faulted with a Rule 56(g) order for failing to address the other elements. That conclusion does not follow from the premise. It is true that when a movant fails to meet its initial summary-judgment burden, the burden does not shift to the nonmovant and the motion should be denied (as happened here). See, e.g. , Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund , 778 F.3d 593, 601 (7th Cir. 2015). That scenario, however, does not sideline Rule 56(g). The rule applies precisely when the court concludes that a moving party is not entitled to summary judgment. Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order...."); Fed. R. Civ. P. 56, Committee Notes on Rules-2010 Amendment ( Rule 56(g)"becomes relevant only after the court has applied the summary-judgment standard"). Rule 56(g) is "ancillary" to the ultimate summary-judgment analysis, operating to "salvage some results" from the time and resources spent in deciding unsuccessful summary-judgment motions. Wright & Miller, 10B Fed. Prac. & Proc. § 2737 (4th ed. 2018). The district court properly used the rule here.
The Committee Notes to Rule 56 add that courts should "take care" to ensure that their use of Rule 56(g)"does not interfere" with a nonmovant's ability to accept a fact for "purposes of the motion only." VitalGo thinks this clarification helps its case, but it does not. VitalGo could have told the district court that it accepted Kreg's performance only for purposes of the cross motions. Litigants do that often. VitalGo chose otherwise and expressly (though improperly, under the rules) challenged Kreg's performance. As a result, the district court could not have known that VitalGo wanted to reserve the performance/breach issue. VitalGo may have had the right to assume Kreg's performance, but it had no right to challenge *416 the performance without evidentiary support. Summary judgment is no time for half-hearted advocacy. See Grant v. Trustees of Indiana Univ. , 870 F.3d 562, 568 (7th Cir. 2017).
VitalGo also makes much of Rule 56(e)(2), which states that a court may deem improperly rebutted facts "undisputed for purpose of the motion ." Fed. R. Civ. P. 56(e) (emphasis added). VitalGo understands the italicized language to mean that "undisputed" labels should expire with the motion's resolution. That may be true for Rule 56(e) purposes, but not for Rule 56(g) purposes. The two rules provide distinct discretionary tools. And Rule 56(g) 's scope is clear-it treats facts "as established in the case ." Fed. R. Civ. P. 56(g) (emphasis added).
We owe a word about the timing of the district court's Rule 56(g) order. As explained earlier, the district court omitted from the first summary-judgment opinion any citation to Rule 56(g), although it did say that Kreg had "established the first three elements" of its claim. The court then stated at the following status hearing-which VitalGo's counsel failed to attend or promptly seek the transcript of-that Rule 56(g) applied, and the court made that decision doubly clear in the second summary-judgment opinion. VitalGo believes this was too late. We disagree. Rule 56(g) does not say that the district court must issue its order contemporaneously with its summary-judgment decision, and it does not say that the order must be in writing. To be sure, best practices are to do both (as the district court later recognized). But the district court's opinion was clear enough and no one paying reasonable attention to the litigation after the first summary-judgment opinion could have thought Kreg's performance and VitalGo's breach were still open questions, so we see no abuse of discretion.
4. The Damages Element and Rule 54(c)
VitalGo further challenges how the district court treated Kreg's failure to establish damages during the first round of summary-judgment. VitalGo contends that once the district court accepted that Kreg had not shown evidence of damages, it necessarily had to grant summary judgment to VitalGo. There are a few problems with this argument.
It is, for starters, unreviewable. After a case goes to trial and the factfinder decides the merits, previous denials of summary judgment are old news. The district court here made a posttrial finding that VitalGo damaged Kreg, a decision which we can (and will) review. But its earlier decision, that there were, at the time, outstanding issues of fact regarding Kreg's damages, is not subject to appeal. See Ortiz v. Jordan , 562 U.S. 180, 184, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011) ; Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc. , 831 F.3d 815, 823-24 (7th Cir. 2016) ; see also Lawson v. Sun Microsystems, Inc. , 791 F.3d 754, 761 (7th Cir. 2015). The argument also flops for another procedural reason: VitalGo did not move on the damages element below, or at least did not do so properly. The district court could not have erred by not granting summary judgment on grounds that VitalGo failed to raise. See Firestone Fin. Corp. v. Meyer , 796 F.3d 822, 829 (7th Cir. 2015) ; Williams v. City of Chicago , 733 F.3d 749, 755 (7th Cir. 2013).
VitalGo's argument fails on its merits, too. Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim. See Fed. R. Civ. P. 56(a). That Kreg did not meet its burden does not mean that VitalGo did. We corrected this mistaken thinking in Hotel 71 Mezz Lender , *417 where we added that denying a summary-judgment motion "normally will leave the movant in essentially the same position," not a worse one. 778 F.3d at 602-03. So too here. Kreg did not bear its burden, but VitalGo-having neither moved on damages nor provided record support-certainly did not either. The district court correctly let the case proceed to trial on the question of damages.
VitalGo also criticizes the district court's reference to Rule 54(c), but it is beside the point. The district court did not, as VitalGo insists, use Rule 54(c) to save Kreg's claim from summary judgment. The court denied summary judgment to Kreg because it had not shown damages. It mentioned Rule 54(c) to indicate that, while Kreg may not be able to obtain injunctive relief, it could still obtain monetary damages. Nothing about that ruling was incorrect or improper.
B. VitalGo's Challenges to the Posttrial Decisions
The next set of challenges relate to the court's posttrial rulings. VitalGo submits that the district court should have dismissed the case rather than allow Kreg leave to amend its complaint to add damages allegations. It also takes issue with the posttrial opinion's liability and damages findings. We again see no reversible error.
1. The Leave-to-Amend Decision
Federal Rule of Civil Procedure 15(a) governs requests to amend pleadings before trial.[2] It instructs courts to "freely give leave when justice so requires," and thus district courts should not deny leave absent a "good reason"-such as futility, undue delay, prejudice, or bad faith. Life Plans, Inc. v. Sec. Life of Denver Ins. Co. , 800 F.3d 343, 357 (7th Cir. 2015) ; see also, e.g. , Lee v. Ne. Illinois Reg'l Commuter R.R. Corp. , 912 F.3d 1049, 1052 (7th Cir. 2019). We examine leave-to-amend decisions for an abuse of discretion. See Manistee Apartments, LLC v. City of Chicago , 844 F.3d 630, 633 (7th Cir. 2016).
The district court did not abuse its discretion. The amendment was neither futile nor sought in bad faith, and, as the district court explained, both parties understood (or should have understood) that damages remained the only matter to resolve after the first summary-judgment decision. There was therefore no unacceptable delay or prejudice involved.
VitalGo, nonetheless, argues the leave-to-amend decision was reversible error because Kreg did not update its disclosures under Federal Rule of Civil Procedure 26(a) to include monetary damages before trial. See Fed. R. Civ. P. 26(a)(1)(A)(iii). Absent prejudice, however, that purported failure is not a Rule 15(a) problem. Rule 37(c) governs the consequences of failing to supplement disclosures, and VitalGo does not challenge any Rule 37(c) decision on appeal (indeed it appears that VitalGo opted not to move under Rule 37 below). In the run-up to trial, VitalGo conducted substantial discovery into Kreg's monetary damages and briefed the issue during the second round of summary judgment. Whatever the consequence of Kreg's supposed failure to update its disclosures, it did not prejudice VitalGo under Rule 15(a).
2. The Finding of Harm
VitalGo challenges the district court's posttrial finding of harm to Kreg.
*418 Because the district court made that finding after a bench trial, we review it for clear error. Trovare Capital Grp., LLC v. Simkins Indus., Inc. , 794 F.3d 772, 778 (7th Cir. 2015). If the finding is plausible in light of the record, we may not reverse even if we might have come out differently. We resolve all doubts in favor of the district court. Carnes Co. v. Stone Creek Mech., Inc. , 412 F.3d 845, 847-48 (7th Cir. 2005).
The court found harm in Kreg's loss of exclusivity rights, future income, customer base, and access to replacement parts. Evidence supports these findings. Poulos testified to them, evidence showed that Kreg's marketing of the beds declined significantly after the breach, and Kreg's expert evaluated the extent of the damage. VitalGo, however, offers three reasons why the district court's finding of harm was clearly erroneous. None has merit.
First, VitalGo contends that it did not harm Kreg because Kreg continued to market the Total Lift Bed after the breach, by advertising the beds online, entering into post-June 2011 contacts with customers, and attending certain tradeshows. Those contentions are irrelevant; the record shows that even if Kreg's relationship with the Total Lift Bed was not a clean break in June 2011, Kreg still suffered harm. As the district court explained, for example, the reference to the beds on Kreg's website did not suggest that Kreg could still rent beds at pre-breach levels. Poulos testified that Kreg had largely "switched off" its marketing for the beds after VitalGo's breach, testimony which the district court found credible. See Carnes Co. , 412 F.3d at 848 (a credibility determination "can virtually never amount to clear error"). As for the post-breach contacts, those contacts were "negligible," as the district court found, compared to Kreg's pre-breach business. And regarding the tradeshows, Kreg booked them "well in advance of VitalGo's breach," and the fact that Kreg attended a few does not suggest that Kreg could market and rent the beds at the level it did before VitalGo's breach.
VitalGo's second argument challenges causation. According to VitalGo, Kreg had not ordered a bed in the ten months before VitalGo breached the agreement in June 2011, and therefore, there was no evidence that VitalGo's breach is what deprived Kreg of the ability to sell and rent the beds. This, too, does not amount to clear error. See In re Emerald Casino, Inc. , 867 F.3d 743, 755 (7th Cir. 2017) ("[C]ausation is a question of fact that we review for clear error."). The record shows that the ten-month lull was likely the result of other factors-Kreg's Total Lift Bed business was still getting off the ground, and it had a history of erratic orders-and not a decided disinterest in marketing and selling the beds. We know the latter is not the case, because Kreg ordered additional beds in September 2011.
Third, VitalGo contests Poulos's testimony that VitalGo harmed Kreg by refusing to supply replacement parts for the beds after the breach, despite the agreement obligating VitalGo to do so for five years after the agreement's termination. The district court decided that Poulos's testimony was credible, and nothing in the record causes us to take the unusual step of upsetting that decision. See, e.g. , Madden v. United States Dep't of Veterans Affairs , 873 F.3d 971, 973 (7th Cir. 2017).
3. Foreseeability of Damages
VitalGo also argues that the district court erred in finding that Kreg's losses were foreseen by VitalGo and thus recoverable as consequential damages. See *419 Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York , 10 N.Y.3d 187, 856 N.Y.S.2d 505, 886 N.E.2d 127, 130 (2008) ; Kenford Co. v. Cty. of Erie , 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176, 180 (1989). Where, as here, an agreement is silent on consequential damages, New York law takes a "common sense" approach that examines the "nature, purpose and particular circumstances of the contract." Schonfeld v. Hilliard , 218 F.3d 164, 172 (2d Cir. 2000).
The district court made its foreseeability finding based on Poulos's testimony, which the court decided was credible and undisputed. Poulos testified that during contract negotiations he made clear to VitalGo that Kreg needed exclusive-distributorship protections to make the agreement worthwhile. Total Lift Beds were a new product at the time, Poulos explained, and exclusivity would offset the risks and investments Kreg had to make to set up a new business segment and develop a customer base. According to Poulos, VitalGo agreed with Kreg's position. Those facts are enough to conclude, as the district court did, that VitalGo foresaw (or should have foreseen) the losses Kreg would suffer if VitalGo breached. See id. at 177 (evidence that party would not have entered an agreement but for a promised feature of the agreement sufficed to show foreseeability).
This leaves VitalGo to challenge, again, the district court's credibility determination. VitalGo says that Poulos's testimony is inconsistent with the agreement, which contemplates Kreg's payment for beds rather than exclusivity. That is a reach. The agreement outlines Kreg's exclusivity rights in the first paragraph, so we know that exclusivity was a part of the bargain. VitalGo also calls Poulos's testimony speculative. We do not see how. He testified to things he and others said during the negotiation.
4. The Damages Assessment
VitalGo's last challenge is to the district court's damages assessment. It contends that the district court "applied the wrong damages theory to the wrong asset, in the wrong way." We review the district court's methodology de novo and its calculation for clear error. Rexam Beverage Can Co. v. Bolger , 620 F.3d 718, 727 (7th Cir. 2010) ; Int'l Prod. Specialists, Inc. v. Schwing Am., Inc. , 580 F.3d 587, 598 (7th Cir. 2009).
VitalGo's "wrong damages theory" argument is that although Kreg sought only lost-asset damages, the district court applied a lost-profit calculation. The Second Circuit has explained the difference under New York Law:
When the defendant's conduct results in the loss of an income-producing asset with an ascertainable market value, the most accurate and immediate measure of damages is the market value of the asset at the time of breach -not the lost profits that the asset could have produced in the future .
Schonfeld , 218 F.3d at 176 (emphases added). VitalGo says the district court based its damages assessment on the profits Kreg could have earned in the future, absent the breach. But that is not what the court did-or that is not all it did. The district court, adopting Kreg's expert model, estimated a fair-market value for the agreement at the time of the breach. It did so by doing what a hypothetical buyer would likely have done: evaluate the profits expected from the agreement, then reduce the expected profit-here, by 10.08 percent-to account for market risk and uncertainty. The court did, then, take "lost future profits into account," but only as the first step in determining "the discounted value" of those profits.
*420 Sharma v. Skaarup Ship Mgmt. Corp. , 916 F.2d 820, 826 (2d Cir. 1990). That is what the law prescribes. See id. ; Schonfeld , 218 F.3d at 176 ; see also Anchor Sav. Bank, FSB v. United States , 597 F.3d 1356, 1369 (Fed. Cir. 2010) ; First Fed. Lincoln Bank v. United States , 518 F.3d 1308, 1315 (Fed. Cir. 2008).
VitalGo's "wrong asset" argument fares no better. VitalGo thinks that the district court should have considered only the value of the beds and exclusivity for the duration of the agreement. That conception of the lost asset is too narrow. A hypothetical buyer stepping into Kreg's shoes would receive not only the right to beds and exclusivity for a period, but all that comes with it. This includes, as Kreg's expert explained and the district court found, the opportunity to develop a customer base and reap profits in the future. The record shows that the agreement was an opportunity to create a lasting business segment, as the district court properly considered the lost asset.
VitalGo's "wrong way" argument has two parts, each of which challenges an assumption the district court applied in calculating the lost-asset damages. First, the district court assumed, after crediting Kreg's expert, that the beds had a ten-year useful life. That assumption was not clear error. VitalGo admitted that the beds were functional for ten years at the summary-judgment stage, and it still does not dispute that some years-long useful-life assumption should apply. Its new position, arguing for an undefined but shorter useful-life assumption, rests on limited counter evidence. New-version beds are sometimes introduced, VitalGo says, and Kreg itself preferred to sell new beds. That evidence, however, does not defeat the district court's reasoned determination.
Second, VitalGo faults the district court's 10.08-percent discount rate. VitalGo thinks this rate is too low, because it does not account for the possibility that the hypothetical purchaser would be a small or new company. The rate therefore does not account for what VitalGo calls small-stock risk and company-specific premiums. We again see no clear error. The district court explained why these premiums should not apply; they assume, without much record support, particular characteristics of the hypothetical buyer.
III. Conclusion
For these reasons, we AFFIRM the district court's judgment.

VitalGo also argued that subject-matter jurisdiction was lacking, but, as the district court correctly ruled, diversity jurisdiction exists. Kreg is an Illinois corporation, VitalGo is a Delaware one, and the amount in controversy is well above $75,000. See 28 U.S.C. § 1332(a).

The district court also examined the request under Rule 15(b), which covers amendments made during or after trial. We think it clear that Rule 15(a) controls a request made before trial, like this one, and so we do not address Rule 15(b).