In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-3060

KEVIN CLANTON,

*Plaintiff-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:15-cv-124 — **Nancy J. Rosenstengel**, *Chief Judge.*

ARGUED SEPTEMBER 11, 2019 — DECIDED NOVEMBER 7, 2019

Before RIPPLE, ROVNER, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.* For four years, nurse practitioner
Denise Jordan treated Kevin Clanton's severe hypertension.
Jordan, an employee of the U.S. Public Health Service, failed
to properly educate Clanton about his disease or to monitor
its advancement. Clanton's hypertension eventually devel-
oped into Stage V kidney disease requiring dialysis and a
transplant, and he sued the United States under the Federal
Tort Claims Act for Jordan's negligent care. After a five-day

bench trial, the district court found the United States liable. The court determined that Clanton had not contributed at all to his own injuries, noting that Clanton did not understand why it was so important to take his medication and to attend all appointments. The court awarded Clanton nearly $30 million in damages. The government appeals the court's comparative-negligence determination and three aspects of the court's rulings on damages. We agree with the government that the court erred in its analysis of comparative negligence, so we vacate the judgment and remand for the court to apply the proper legal standard. As for damages, however, we find no reversible error.

## I.

Kevin Clanton first visited nurse practitioner Denise Jordan for medical care after high blood pressure caused him to fail a pre-employment physical exam. Jordan, an employee of the Southern Illinois Healthcare Foundation, treated Clanton at two health clinics in East St. Louis, Illinois. At his first appointment, Jordan ordered routine lab work and diagnosed Clanton with obesity and hypertension. On Clanton's second visit, she gave him medication and asked him to come back in one week. Clanton did not return in a week; instead, he failed to return to see Jordan until he showed high blood pressure at another employment-related physical exam two years later.

During the two years that followed, Clanton returned to Jordan for care ten times. Clanton often went long stretches without returning to see Jordan, and he failed to take his prescribed medicine if he was not feeling sick. For her part, Jordan never explained why it was important for Clanton to take his medications and to attend all appointments even if he was feeling fine. In fact, Jordan never educated Clanton about

hypertension, its associated risks, or the factors that increased the risks for Clanton in particular.

Three years after Clanton's first visit, Jordan ordered new lab tests, but she never reviewed the results. If Jordan had seen the lab work, she would have noticed signs of kidney disease and referred Clanton to a nephrologist. Instead, Clanton did not learn for another year and a half that his hypertension had caused serious damage to his kidneys. A doctor finally diagnosed Clanton with end-stage renal disease, and Clanton began hemodialysis treatment and joined the kidney-transplant waiting list. Clanton eventually received a successful kidney transplant, but he will probably need further rounds of hemodialysis and one or more transplants in the future. Medicare Part B paid for Clanton's hemodialysis and may cover future rounds of hemodialysis as well.

Clanton sued the United States under the Federal Tort Claims Act for Jordan's negligence because Jordan and her employer are employees of the U.S. Public Health Service. After a five-day bench trial, the district court determined that Jordan had deviated from the standard of care by failing to adequately educate Clanton about the severity of his condition, failing to refer him to a specialist, and failing to consult his lab reports. The court found no comparative negligence on Clanton's part and awarded him nearly $30 million in damages.

In a motion to reconsider, the government challenged the court's damages rulings on three grounds. First, it argued that the court erred in rejecting the government's election to pay some future damages in periodic installments. Second, the government contended that the court should have conducted a damages comparison when it calculated noneconomic

damages. And third, the government argued that the court should have deducted some of its damages obligations because Medicare had covered Clanton's hemodialysis. The district court agreed to conduct a damages comparison analysis, but after doing so, it declined to change its damages award. It refused to reconsider its rulings with respect to periodic payment and partial offset. The government appeals the district court's determination that Clanton was not comparatively negligent and all three of its rulings on damages.

## II.

The government argues that the district court failed to apply the correct legal standard when it evaluated Clanton's comparative negligence. Because Jordan treated Clanton in Illinois, Illinois tort law applies. 28 U.S.C. § 1346(b)(1). We review de novo a district court's determination of state law in an FTCA case. *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001).

The parties agree on the proper standard to assess a plaintiff's comparative negligence under Illinois law. Courts must apply the familiar reasonable-person standard, an objective test that asks "whether plaintiff … used that degree of care which an ordinarily careful person would have used … under like circumstances." *McCarthy v. Kunicki*, 823 N.E.2d 1088, 1101 (Ill. App. Ct. 2005). But the district court here failed to articulate that standard—or to cite to any legal authority at all—in its discussion of Clanton's comparative negligence.

Clanton insists that the district court applied the correct standard in practice, even if not in name. But we are not convinced. The court focused its assessment of Clanton's negligence on his own limited understanding of his condition.

Because Clanton didn't understand the seriousness of his severe hypertension, the court reasoned, he did not act negligently when he missed medical appointments or when he failed to take his medicine. But Clanton's subjective understanding does not properly end the inquiry. Illinois law requires the court to take the additional step of comparing Clanton's understanding of his condition to that of a reasonable person in his situation. *Id.* Clanton was in the position of a person whose caregiver had failed to provide information about the severity of his condition. Yet he also had a few external clues that he was seriously unwell—for example, two employment-related physicals showed that he had dangerously high blood pressure. The district court must determine how a reasonable person in the same position would have acted and compare Clanton's behavior to that objective standard of care.

We vacate the judgment and remand to the district court so that it can assess Clanton's comparative negligence under Illinois's reasonable-person standard.

## III.

The government argues that on remand the district court should also revisit some of its rulings on damages. The government first focuses on the court's rejection of the government's election to pay Clanton some of the damages award in periodic installments. When the court calculated Clanton's damages, a since-repealed Illinois statute offered a medical-malpractice defendant that option. 735 ILCS 5/2-1705 to -1709 (repealed Aug. 16, 2019). But over the government's objection, the court held that the statute permitted it to reject the election—which the court did.

The government contends that the court misread the statute. According to the government, the statute entitled it to elect a periodic-payment schedule, and in rejecting that election, the district court asserted discretion that the statute did not give it. Maybe so. But Illinois has now repealed the periodic-payment statute, and if periodic payment is no longer an option, it doesn't matter whether the district court made a mistake. Before we go any further, therefore, we must determine whether Illinois law makes the repeal of this statute retroactive.

This question is controlled by Illinois's long-standing rule that the repeal of special remedial statutes applies retroactively to pending cases. A special remedial statute is one that creates a new remedy for one particular subject. *See People ex rel. Eitel v. Lindheimer*, 21 N.E.2d 318, 320–21 (Ill. 1939). In *Shelton v. City of Chicago,* for example, the Supreme Court of Illinois held that a law providing a damages remedy for victims of mob violence qualified as a special remedial statute. 248 N.E.2d 121, 123–24 (Ill. 1969). *Shelton* points the way here. Like the statute in *Shelton*, the periodic-payment law created a new remedy for one particular subject—it provided a method for defendants to pay damages awards in medical-malpractice cases. Under *Shelton*'s reasoning, then, the periodic-payment statute qualifies as a special remedial statute.

When a special remedial statute is repealed, the effect under Illinois law is clear: "The unconditional repeal of a special remedial statute without a saving clause stops all pending actions where the repeal finds them. If final relief has not been granted before the repeal goes into effect it can't be granted afterwards." *Lindheimer*, 21 N.E.2d at 321. Since Illinois's periodic-payment statute was a special remedial statute with no

saving clause, its repeal "stops all pending actions where [it] finds them." *Id.* Periodic payment is no longer available to the government, even if the district court erred in interpreting the periodic-payment statute.

Rather than addressing the rule about special remedial statutes, the government invokes Illinois's general rule about repeals: those "that are procedural in nature may be applied retroactively, while those that are substantive may not." *Caveney v. Bower*, 797 N.E.2d 596, 602 (Ill. 2003). Because Illinois's periodic-payment statute had substantive components—most notably, it entitled defendants to apply a 6% discount rate to certain damages—the government insists that the repeal does not retroactively eliminate the availability of periodic payment.

The *Caveney* rule, however, is inapposite. The substantive/procedural distinction is the "clear legislative directive" of the general saving clause of section 4 of Illinois's Statute on Statutes, 5 ILCS 70/4. *Caveney*, 797 N.E.2d at 602. But the Supreme Court of Illinois has made clear that the general saving clause "does not apply to express repeals of special stat[u]tory remedies." *Shelton*, 248 N.E.2d at 123; *see also People v. Glisson*, 782 N.E.2d 251, 257 (Ill. 2002) (distinguishing repeals of special statutory remedies). It follows that even those special remedial statutes that seem more substantive than procedural are not applicable after repeal. Put differently, the rule regarding special remedial statutes is a carve-out from the general rule that the government invokes.

The Supreme Court of Illinois reaffirmed the validity of this carve-out as recently as 2018. In *Perry v. Department of Financial & Professional Regulation*, the court held that the repeal of a particular provision of Illinois law was substantive and

therefore applied only prospectively. 106 N.E.3d 1016, 1034 (Ill. 2018). In explaining that conclusion, it emphasized that the provisions were not procedural in nature; "[n]or can [they] be said to be changes to special remedial statutes." *Id.* *Perry*'s analysis thus confirms that remedial statutes are a category distinct from both substantive and procedural statutes. *Perry* went on to explain that "courts can apply retroactively statutory changes to procedural or remedial provisions." *Id.* (quoting *Glisson*, 782 N.E.2d at 257). The court thus reaffirmed that repeals of remedial statutes, like procedural repeals, apply retroactively to make the repealed statute unavailable in pending cases.

Since periodic payment is no longer available to the government, the district court need not revisit its interpretation of the periodic-payment statute on remand.

## IV.

The government's second challenge to the damages award addresses the district court's calculation of noneconomic damages. The district court initially awarded Clanton $13,750,000 in noneconomic damages. In response to the government's motion to reconsider, the court compared the damages in cases similar to Clanton's. The court employed two methods of comparison. The court first conducted a gross award comparison to determine that the initial award was appropriate. The court then confirmed that award using the ratio method. The government takes issue with both methods. We review the court's approach to determining damages with the recognition that the court's new comparative-negligence analysis may affect the actual damages values.

## A.

In its challenge to the gross award comparison, the government argues that the court improperly excluded two cases.[1] To conduct a gross award comparison, a court compiles a list of cases from across districts that are factually similar to the one at hand. The court then culls from the list those cases that are sufficiently distinguishable to make them unhelpful comparators. Finally, it compares the total noneconomic damages awarded in those cases.

Here, the district court began by creating a list of twenty potential cases for comparison. In its culling process, the court excluded two potential comparator cases that alleged torts occurring in Hawaii: *Campano v. United States*, No. 15-439, 2018 WL 1182571 (D. Haw. Mar. 7, 2018), and *Mamea v. United States*, 781 F. Supp. 2d 1025 (D. Haw. 2011). Hawaii caps the amount of pain-and-suffering damages that a court can award as part of the total noneconomic damages, but Illinois does not. The district court thus determined that *Campano* and *Mamea* were "not particularly useful" comparators because it had no way of determining the total noneconomic damages those plaintiffs would have won if the torts had occurred in Illinois.

The government argues that it was legal error to exclude *Campano* and *Mamea* from the comparison. We review a district court's damages methodology de novo, *Kreg*

---

[1] While we have acknowledged that "the Supreme Court of Illinois does not require or even encourage such comparisons," we have held that this rule does not bind a federal court in a case brought under the Federal Tort Claims Act. *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

*Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 419 (7th Cir. 2019), but we review the application of that methodology for abuse of discretion. The district court's methodology was gross award comparison; the court's decision to exclude *Campano* and *Mamea* was a choice it made in calculating damages using that methodology. We therefore review the exclusion of *Campano* and *Mamea* for abuse of discretion.

*Campano* and *Mamea* might have provided the court with some information for comparison, but it is true that Hawaii's damages cap made them imperfect comparators. It was therefore within the district court's authority to determine that dissimilarities between those cases and Clanton's outweighed their usefulness to the gross award comparison. The court did not abuse its discretion by excluding *Campano* and *Mamea* from its damages comparison.

B.

The government also objects to the court's second method of damages comparison: the ratio method. As with the gross award comparison method, a court applying the ratio method begins with a list of comparable cases. Yet rather than comparing the total noneconomic damages, the court compares the ratio between economic and noneconomic damages in the comparator cases. The court then works backward from the more concrete economic damages in the present case to arrive at a proportionate number for noneconomic damages.

The government argues that the ratio method is inappropriate for calculating damages in a personal-injury case. We need not address that argument, though, because the court's application of the ratio method in this case did not affect the damages award. *Cf. Cook v. Niedert*, 142 F.3d 1004, 1016 (7th

Cir. 1998) (declining to remand on a legal error of methodology in the calculation of attorneys' fees because the error would not have affected the total fees awarded). The court first calculated noneconomic damages and then relied on the gross award comparison to determine how its damages determination compared to other similar cases. Only then did the court apply the ratio method, characterizing it as an alternative comparison methodology that merely confirmed the correctness of its award. In other words, the court gave every indication that it would have awarded the same damages if it had not applied the ratio method. There is therefore no reason for us to instruct the district court to do anything differently.

## V.

Finally, the government argues that the district court should have deducted a portion of Clanton's damages because Medicare Part B covered his hemodialysis. The collateral-source doctrine allows a tort victim whose out-of-pocket costs are compensated—for example, by insurance or a benefits program—to still recover his full losses from the tortfeasor if the compensation comes "from a source wholly independent of, and collateral to, the tortfeasor." *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008) (citations omitted). The Supreme Court of Illinois has explained that "[t]he justification for [the collateral-source] rule is that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons." *Wilson v. Hoffman Grp., Inc.*, 546 N.E.2d 524, 530 (Ill. 1989).

The government contends that Clanton's Medicare benefits do not come from a "collateral" source because general taxpayer revenues fully fund Clanton's damages and

partially fund Medicare Part B, which fully covered (and may continue to cover) Clanton's hemodialysis. As the government sees it, Clanton will be double-dipping into the public purse if he receives the full amount of his damages. To prevent that, the government asked the district court to reduce Clanton's damages award by the fraction of his Medicare benefits that is traceable to general taxpayer funding. The district court refused to give the government this partial offset, characterizing the request as "an idea that was brought up in theory forty years ago, but, as best the Court can tell, has never been explicitly approved of, much less implemented in practice."[2] The government urges us to reverse this ruling.

Whether a benefit is collateral to a damages payment is a question of state law. *Molzof v. United States*, 6 F.3d 461, 464 (7th Cir. 1993). To decide whether a payment is collateral, Illinois courts consider both the "source" of the benefits payments and the payments' "purpose and nature." *Laird v. Ill. Cent. Gulf R.R. Co.*, 566 N.E.2d 944, 955 (Ill. App. Ct. 1991). We therefore look to the source and the purpose and nature of Clanton's benefits to determine whether Illinois courts would grant the government the partial offset that it seeks.

---

[2] The government has not pointed to a single example of an Illinois court granting a defendant a partial offset. Other circuits applying the substantive law of other states suggested in some older cases a hypothetical openness to the possibility of a partial offset—but none actually allowed the remedy. *See, e.g.*, *Overton v. United States*, 619 F.2d 1299, 1309 (8th Cir. 1980) (noting in an FTCA case where Medicare covered the plaintiff's injury that "[t]here may be cases in which the government is entitled to a partial set-off …."); *Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir. 1977) (expressing openness to a partial set-off in an FTCA case involving Social Security and veterans' benefits).

*Laird v. Illinois Central Gulf Railroad Co.* guides our analysis. In that case, a railroad was found liable to one of its employees for injuries that the employee's disability benefits had compensated. Both the railroad and the employee had contributed to the disability fund that covered the employee's injuries. 566 N.E.2d at 955. But the court decided that the defendant's contribution to the disability fund did not justify deducting any damages when the plaintiff had also contributed to the source of the benefits. *Id.* It focused on the purpose and nature of the disability benefits: they were meant to compensate employees for their service with the employer, and the plaintiff could collect them regardless of the defendant's liability. *Id.* at 956. Thus, unlike a fund established to indemnify an employer from liability, the purpose of the disability benefits was independent of the obligation to pay damages to the plaintiff, which meant that they were collateral to the damages award. *Id.* Importantly, the court in *Laird* did not partially offset the defendant's damages to the extent of the defendant's contribution to the fund. Instead, the *Laird* court declined to deduct any damages at all.

Both the source and the purpose of Clanton's benefits are analogous to the plaintiff's in *Laird*. Medicare Part B is funded in part by general taxpayer revenues and in part by monthly premiums paid by covered parties. So, as in *Laird*, the defendant and the plaintiff each contributed to the fund that paid Clanton's benefits.[3] And as in *Laird*, the benefits here are not

---

[3] The government asks us to distinguish Clanton's contribution to Medicare from the plaintiff's contribution to the disability fund in *Laird*. The plaintiff in *Laird* could collect disability benefits only because he paid into the disability fund. By contrast, the government characterizes

intended to indemnify the government. On the contrary, Clanton would have been able to collect his Medicare benefits even if the government had not been liable for Jordan's negligence. We therefore agree with the district court that Clanton's benefits are collateral to his damages award under Illinois law, and the government is not entitled to a partial offset.

\* \* \*

We VACATE the judgment and REMAND the case for further proceedings consistent with this opinion.

---

Clanton's benefits as a gratuity available to everyone diagnosed with end-stage renal disease—even those who don't contribute to Medicare. Thus, the government argues, Clanton did not bargain for the benefit of his Medicare payments, notwithstanding his contributions. Since *Laird*, however, the Supreme Court of Illinois has rejected a "benefit of the bargain" theory that entitles plaintiffs to a full recovery of medical expenses only "where the plaintiff has paid some consideration for the benefit of the write-off." *Wills*, 892 N.E.2d at 1026. For that reason, we don't think that Illinois courts would find the distinction dispositive.